Argued December 1, decided December 21, 1909.

## OLLSCHLAGER'S ESTATE *v.* WIDMER.

[105 Pac. 717.]

MARRIAGE—VALIDITY—BURDEN OF PROOF.

1. Under Section 788, subd. 30, B. & C. Comp., declaring that the presumption exists that a man and woman deporting themselves as husband and wife entered into a lawful marriage, and independent thereof, the burden of proof is on the one objecting to the validity of a marriage, however celebrated, whether regular or irregular, or however proved.

MARRIAGE—EVIDENCE—PRESUMPTIONS.

2. Proof of marriage, whether solemnized in strict conformity with law or not, entered into in good faith and under the belief that the ceremony is legal, overcomes any presumptions arising out of prior meretricious relations, and the burden of proof is on the party questioning the marriage.

MARRIAGE—EVIDENCE—PRESUMPTIONS—REBUTTAL.

3. Evidence of the declarations and conduct of the parties, together with other proof, *held* not to rebut the presumption of the existence of a valid marriage between them.

MARRIAGE—EVIDENCE—PRESUMPTIONS—FOREIGN MARRIAGE.

4. The fact that no record of a marriage license required by the law of a sister state can be found many years after an alleged marriage in that state does not overcome the presumption invoked in support of the legality of the marriage.

MARRIAGE—LEGALITY—WHAT LAW GOVERNS.

5. The legality of a marriage must be determined by the law of the state in which the ceremony was performed.

MARRIAGE—EVIDENCE—REBUTTAL OF PRESUMPTION.

6. Where the failure to procure a marriage license does not invalidate the marriage, but only affects the officer performing the ceremony, the failure to find a record of a license is only a circumstance tending to question the marriage, unless accompanied by cogent testimony rebutting the presumption of law in favor of the validity of the marriage.

MARRIAGE—PRESUMPTIONS—REBUTTAL.

7. Where there is evidence creating a foundation for the presumption of marriage, the presumption can only be overcome by the most cogent and satisfactory evidence.

From Marion: WILLIAM GALLOWAY, Judge.

See, also, 50 Or. 55 (89 Pac. 1049).

For appellants there was a brief and oral arguments by *Mr. Martin L. Pipes* and *Mr. Carey F. Martin*.

For respondent there was a brief and oral arguments by *Mr. Peter H. D'Arcy* and *Mr. George G. Bingham*.

MR. JUSTICE KING delivered the opinion of the court.

This is a contest over the distribution of the estate of Henry Ollschlager, deceased; the sole question presented being whether he and the petitioner, Mrs. Henry Ollschlager, were legally married. The decedent died in Marion County March 24, 1904, leaving an estate estimated at about $21,000, of which Theodore M. Barr was appointed administrator, qualified as such, and proceeded

with the administration, which position he has since held. In his final account he asked permission to distribute all of the residue of the estate to the petitioner named, as the widow of the decedent; but J. M. Widmer, Margaret M. Widmer, Gertrude D. Widmer, George C. Widmer, Christian Sulzen, Hubert Sulzen, Karl Sulzen, Peter Sulzen, Elizabeth Sulzen, and Joseph Sulzen, as collateral kindred of the decedent, objected, urging that the petitioner was not the widow of the decedent, nor in any way related to him, and therefore not entitled to share in his estate. The objections were overruled, and the prayer of the administrator granted. On appeal to the circuit court the rulings of the county court were sustained, but here reversed on questions of procedure, and remanded for a new trial. 50 Or. 55 (89 Pac. 1049). The cause was re-tried, and, from decrees entered in petitioner's favor, comes here again on appeal.

The facts disclosed by the record, so far as material to this controversy, are: Between the years 1883 and 1887, Henry Ollschlager, the decedent, a resident of Marion County, took two or three trips to Germany, visiting relatives residing there, among them a sister, who, in 1887, died, leaving an estate in which he had an interest. For a number of years there had resided with this sister a Miss Mary Sabilla Hamaker, now the petitioner herein. Before taking his last trip to Germany, in the summer of 1887, at which time he received his share in his sister's estate, Ollschlager told numerous friends about Miss Hamaker, and that one purpose of his trip was to persuade her to marry him, alluding to the fact that she had for a number of years been his sister's housekeeper. In this venture he was successful; but on preparing to return, and after she had consented to become his wife, they found that, under the marriage customs prevailing in that part of Germany, the inconvenience and delay incident to their contemplated wedding was greater than

anticipated, on account of which they decided to start for America at once, postponing their marriage until their arrival in this country. On embarking decedent registered their names as "Mr. and Mrs. Henry Ollschlager." Petitioner could speak no English, so she states, and therefore left all arrangements to him, testifying to having no knowledge as to how or whether they were registered on the steamer, but that they occupied separate rooms, and as soon as they reached Philadelphia went to the office of some one, whom she supposed, and was led to believe, was an officer duly authorized, under the law, to marry them, and by whom a marriage between her and Ollschlager was solemnized, or, at least, under the ceremony then performed she was led to think, did believe, and at all time since has understood, she became his wife, and, by reason thereof, his widow. On their arrival in Salem, petitioner was introduced by Ollschlager as his wife, and, until his death, was so recognized by all of their acquaintances and friends, comprising the narrow circle in which they moved and lived. His kindred, here questioning the legality of their marriage, visited them occasionally; among them being nieces, who wrote letters to the petitioner, addressing her as "aunt," and otherwise recognizing her as decedent's wife until about the time of his death, prior to which the marriage was not questioned by any of them. Rumors growing out of the statements purporting to come from decedent, about seven or eight years after returning with his bride, were afloat, but were not deemed by the kindred of sufficient importance to be acted upon, socially or otherwise. On his return from Germany, Ollschlager told a number of his acquaintances that they were married, and corroborated petitioner's statements to the effect that their marriage was solemnized in Philadelphia, mentioning that it took place before a "squire," or justice of the peace.

1. Before entering upon a discussion of the testimony, presented for the purpose of neutralizing the evidence adduced by petitioner, some of the legal phases, material to the controversy, will be noted. The first point, the determination of which is essential, in order to reach a definite conclusion, is: Upon whom does the burden of proof, in this case, rest? "The burden of proof," says Mr. Justice BEAN (In *re Estate of Megginson*, 21 Or. 387: 28 Pac. 388: 14 L. R. A. 540), "is on the party objecting to the validity of such a marriage," concerning which rule, Bishop, Marriage and Divorce, § 457, there quoted with approval, says:

"When a marriage therefore has once been shown, however celebrated, whether regularly or irregularly, or however proved, whether directly or by circumstantial evidence, the law raises a strong presumption in favor of its legality; so that the burden is with the party objecting throughout, and in every particular, to prove, against the constant pressure of this presumption of law, that it is illegal and void. And it has been considered that the validity of a marriage cannot be tried like any other question of fact which is independent of presumption, because the law, besides casting the burden of proof upon the objecting party, will still presume in favor of the marriage, and this presumption increases in strength with the lapse of time through which the parties are cohabiting as husband and wife. It being for the highest good of the parties, of the children, and of the community, that all intercourse between the sexes in its nature matrimonial, should be such in fact, the law, when administered by enlightened judges, seizes upon all presumptions both of law and of fact, and presses into its service all things which can help it in each particular case, to sustain marriage, and repel the conclusion of unlawful commerce."

It is also recognized by our statute (Subd. 30, Section 788, B. & C. Comp.) as a satisfactory presumption, until overcome, "that a man and woman, deporting themselves as husband and wife, have entered into a lawful contract of marriage."

2. In this connection, however, counsel for the objectors contend it is disclosed by the record that the first relations between the parties were meretricious, by reason of which it is maintained that the rule above invoked does not apply. The weakness of this position lies in assuming a premise not clearly established. It first appears that Ollschlager went to Germanw to marry the person whom he brought back with him, and whom he represented as his wife. They, as stated, had endeavored to get married before starting, but, probably on account of the delays and expense incident to ceremonies of that character, or for some other reason satisfactory to each, changed their plans, delaying the wedding until they reached the United States. No evidence whatever is presented tending to, in any way, establish any improper relations between them, further than the deposition received in evidence, showing that, when taking the steamer for this country, their names were registered as "Mr. and Mrs. Henry Ollschlager." Of this the petitioner testifies she has no knowledge; that, being unconversant with the English language, she left every arrangement relative to the trip to decedent; but that they occupied different rooms and were married when they reached Philadelphia. There is no proof that either were persons of a character of whom meretricious relations might be inferred, and their subsequent unquestioned reputation, in this respect, develops a forcible presumption that the inference sought to be drawn from the fact that some one on the steamer, crossing the Atlantic during 1887, registered as indicated, the identity of whom is not clearly established, it without merit. Again, whatever deduction may be made from this incident, the weight of authority is to the effect that even though libidinous relations may, in the first instance, be established, proof of subsequent marriage, whether solemnized in strict conformity with law or not, if entered into in

good faith, and under the belief that the ceremony was legal, overcomes any presumption arising out of such unconventional relations, shifting thereby the burden of proof upon the party questioning the marriage: 8 Ency. Ev. 450; Moore, Facts, § 549; *Gall* v. *Gall,* 114 N. Y. 109 (21 N. E. 106) ; *White* v. *White,* 82 Cal. 427, 439 (23 Pac. 276: 7 L. R. A. 799) ; *In re* Homeyards' Estate, 10 Pa. Dist. R. 730.

3. This brings us to a consideration of the testimony by which it is sought to contravene the proofs by which a *prima facie* case is made out in petitioner's favor. The first indication disclosed of any attempt on the part of Ollschlager to deny his marriage appears from the testimony, admitted without objection, of J. M. Widmer, in reference to a conversation with the decedent, concerning which Widmer says:

"The earliest I recollect, I don't remember the year it was, quite long years back, we were sitting on the porch. He says to me, 'I am not married to that woman.' He said further, 'I don't want her to hear what I say, because,' he said, 'she is in league with a number of people here.' I know he was at that time, I considered, in a good state of mind. He said they were trying to swindle him out of his money; that she was talking and visiting parties that was counselling her to do such a thing; trying to get hold of his money."

The witness fixes the date of this purported statement in 1893 or 1894. In support of this position, it appears that at one time, when Ollschlager's attorney prepared a legal document, requiring for its proper execution the signatures of both himself and wife, he remarked it was unnecessary for her to sign it, because, as he said, they were not married. The instrument, however, was finally executed by the affixing thereto of their names as husband and wife. This occurred about the year 1895. Another incident alluded to is that, after petitioner heard of her husband's remark, she was very much agitated,

telling her friends they were married, and were married in the old country. Evidence is also adduced showing that no license appears of record in Philadelphia, authorizing the marriage, and that no record of the marriage, or written document of any kind in reference thereto, can be found. Before considering the effect of this proof, it is well to note that Ollschlager, about the year 1903, was pronounced insane and committed to the asylum, where he remained until his demise. The statements alluded to by witness Widmer, if actually made, are not only inconsistent with decedent's many years of previous conduct toward petitioner, in which she was always acknowledged by him as his wife, but it is quite possible, in fact very probable, that at about the time decedent made such purported statements he was suffering from a mental delusion of some kind. The statement that she was plotting with others, against him, was evidently a manifestation of a mental state which, although temporary, was a slight forerunner of his subsequent insanity. It is disclosed that he was always very eccentric, with miserly tendencies, as evidenced, after his commitment to the asylum, by the finding of $2,700 in gold in his house; and his conduct, in not wanting petitioner to sign the legal document with him, concerning which his lawyer testifies, was doubtless the result of some eccentric notion, or hallucination, causing him, temporarily, to declare she was not his wife. Moreover, she did, in fact, sign the instrument with him, in his presence, before witnesses, and under seal; each thereby acknowledging their marital relations before an officer; thus, by their solemn joint acts and conduct, rebutting any denials he may have made in relation thereto, added to which is the further fact that he continued to live with and recognize her as his wife, and for many years thereafter, until his commitment to the asylum, they lived together amicably and agreeably, deporting themselves in every way consistent with the

presumption of marriage. The theory of temporary derangement is therefore more plausible than to infer that these express and implied admissions were deceptive. Nor is the fact that petitioner reported she was married in Germany, on hearing of the rumor, occasioned by her husband's remark to the effect that they were not married, of much significance or entitled to much weight, as tending to countervail the proof in support of her ultimate marriage. She may have deemed the agreement entered into between them in Germany, and subsequently consummated by their marriage in Philadelphia, ample to justify the remark, or she may have had other reasons for her statement. It is nothing unusual for persons, whose veracity is rarely, if ever, questioned, when harassed by inquiries from the curious, at a time when unfavorable rumors are unexpectedly set afloat in a neighborhood concerning them, to temporarily in some impatient response, depart from their regular course, deeming it unnecessary to explain in detail every incident or fact giving rise thereto; nor is such a procedure, necessarily, any reflection upon their integrity.

4. A careful review of all the evidence offered by the objectors leaves practically no proof to rebut, with much force, the claim of marriage, except the disclosure that no license, or record of license authorizing it, can be found. This at first would appear to contribute much weight to the theory advanced by the objectors, and, if in a jurisdiction where marriage without a license is void, would probably be adequate for the purpose offered; but when viewed under the laws, and interpretations· thereof, in Pennsylvania, where the marriage occurred, could not have that effect. Prior to 1885 no marriage license was required in Pennsylvania. The ceremony in question took place in 1887, and it is not a violent presumption to assume that the "squire" was unaware of all the changes enacted in the laws up to that time, and, accordingly,

.advised that no license was necessary. Nor can the fact that no record can now be found, regarding this event, be held sufficient to overcome the presumption, which the law invokes in support of the legality of the marriage in question: *Caujolle* v. *Ferrie,* 23 N. Y. 90; *Badger* v. *Badger,* 88 N. Y. 553 (42 Am. Rep. 263); *Womack* v. *Tankersley,* 78 Va. 242.

. 5. Another, and more cogent, reason, however, why the failure to discover a record of the license cannot avail the objectors in this case, is that the legality of the marriage must be determined by the laws of the state in which the marriage ceremony was performed: 26 Cyc. 829; *Sturgis* v. *Sturgis,* 51 Or. 10 (93 Pac. 696: 15 L. R. A. (N. S.) 1034); *Nelson* v. *Carlson,* 48 Wash. 651 (94 Pac. 477.)

6. Under the rule universally enunciated by the courts of Pennsylvania since the adoption of the marriage license act in 1885 (Act June 23, 1885 [P. L. 146]), the failure to procure a license cannot invalidate the marriage. Such a procedure affects only the officer performing the ceremony, who thereby becomes guilty of a misdemeanor and subject to a fine: Biesecker's Estate, 7 Pa. Dist. R. 70. It follows that the failure to find a record of license is only a circumstance tending to question the marriage, and, unless accompanied by cogent testimony tending to rebut the presumptions of law in their favor, such proof is insufficient for the purpose here presented. The adjudications by the courts of Pennsylvania recognized, without doubt, the well-known maxim; *"Concensus, non concubitus, facit matrimonium."* Broom's Leg. Max (7 ed.) 375. One of their leading cases upon the subject is *Commonwealth* v. *Haylow,* 17 Pa. Super. Ct. 541, in which it is held that a marriage is a civil contract, and that no particular form or rule is essential to its validity. In discussing this principle, the court, at page 547, observes:

"It is true that the parties did not use the formal words of the marriage ceremony, nor was it necessary that they

should do so, if each so understood the relation into which they were about to enter, and their words, fairly interpreted, show that they then and there mutually consented to it. With us marriage is a civil contract, which may 'be completed by any words in the present time without regard to form' (*Hantz* v. *Sealy*, 6 Bin. 405) ; the essential to its validity being the consent of the parties able to contract."

Also, in Comly's Est., 185 Pa. 208 (39 Atl. 890), the showing, made in support of the marriage, was not as clear as in the case under consideration. The wife, it appears, had been divorced from a former husband. The court, in discussing the question there involved, as to whether the marriage, under the facts presented, could be deemed valid, say:

"The decedent had satisfied himself by personal inquiry that the divorce between the woman and her former husbanad had been perfected, and he had formally proposed to her, and had been as formerly accepted. At a later day he said to her: 'Would you be willing to marry me in this way: that you and I are to live together until death separate us; I take you to be my wife, and you take me to be your husband?' She replied: 'Yes, sir; until death separate us.' Even in form this was an absolute contract. The words of obligation on both sides were in *praesenti*. The decedent then asked: 'Are you willing for that?' And the claimant answered: 'I guess I would be; but don't you think we had better be married by a minister?' The decedent met this objection by saying: 'It is just as lawful in this state as if we were married by a minister. All the ministers in creation cannot make you happy or make you do what is right; but if we live together, and do what is right, we are just as lawfully married as if a dozen ministers married us.' He was, theologically and technically, right in his position. See *Richard* v. *Brehm*, 73 Pa. 140 (13 Am. Rep. 733.) The woman was convinced by it, and she accepted his offer to take her as his wife by immediately making her abode with him. Can it be possible that any words which she might have spoken could have made out a present contract on her part more absolutely than did this act of acceptance? She had said

she would be willing to take him as her husband if a minister should marry them. He had assured her that a minister was not needed, and she thereupon unconditionally took him. Was it necessary to say in words what this act said more loudly than words? In a hundred cases which might be cited, it has been decided that silence means acquiescence. In this case there was something more potent than silence—the deliberate action of the claimant. The contestants admit that if she had said to the decedent 'I take you,' she would have become his lawful wife. They aver that she said instead, 'I will be willing to take you,' and thereupon she actually took him at his word and became a profligate. This is a narrow distinction on which to hang the character of a woman and the legitimacy of her children. Just the opposite rule prevails, however. Where words *in futuro* in an agreement to marry are followed by cohabitation, the contract is executed, and the marriage is valid."

7. Counsel for objectors complain because of some evidence offered, but rejected by the court, the purport of which was that the petitioner is a Catholic, and that under her religious belief, she should have desired the marriage to take place before a priest. It is unnecessary to ascertain whether testimony of this character was admissable, for counsel, in offering their proof, did not pursue the course required by our statute, as announced in *Sutherlin* v. *Bloomer,* 50 Or. 398, 404 (93 Pac. 135.) As has been declared by practically every decision upon the subject, all presumptions are in favor of matrimony. The Court of Appeals of New York, in *Haynes* v. *McDermott,* 91 N. Y. 451, 459 (43 Am. Rep. 677), says:

"The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. In *Morris* v. *Davies,* 5 Cl. & Fin. 163, Lord LYNDHURST, speaking of this presumption, says: 'The presumption of law is not lightly to be repelled. It is not to be broken in upon, or shaken by a

mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory, and conclusive.' "

After a careful consideration of the testimony before us, and application of the principles of law applicable thereto, we are of the opinion that the evidence, offered in support of the objections to the final account of the administrator, falls far short of overcoming the presumption in favor of the marriage of decedent and petitioner. We deem it established by cogent proof that they were legally married, and, accordingly, hold that the petitioner is the sole heir, and legally entitled to the estate of Henry Ollschlager, deceased.

The decree of the trial court is therefore affirmed.

AFFIRMED.