Argued October 4, 1956, affirmed April 24, 1957

IN THE MATTER OF THE ESTATE OF JOHN L. KELLEY, DECEASED

KELLEY ET AL *v.* KELLEY

310 P. 2d 328

*C. R. Sloniger,* of Portland, argued the cause and filed a brief for appellants.

*C. E. Wheelock,* of Portland, argued the cause for respondent. On the brief were Wheelock & Richardson, of Portland.

Before WARNER*, and ROSSMAN, LUSK, BRAND, PERRY** and McALLISTER, Justices.

McALLISTER, J.

The plaintiffs, Shelton D. Kelley and John W. Kelley, appeal from two orders of the circuit court for Multnomah county holding in effect that the marriage of their father, John L. Kelley, to the defendant, Ruth M. Kelley, was valid and that she as his widow is entitled to share with the plaintiffs in his estate.

The appellants' brief contains a detailed statement

* Chief Justice when case argued.
** Chief Justice when case decided.

of facts, all admitted by defendant in her brief, from which it appears that the defendant was formerly the wife of Alvin Earle Gehri and resided with him in the state of Washington; that Gehri filed a suit for divorce against the defendant in the Superior Court for Pierce county, Washington; that on March 18, 1949 an interlocutory decree of divorce was granted to Gehri which provided that it did not dissolve the marriage or grant a divorce; that the applicable Washington statute authorized the entry of a final decree of divorce at any time after six months from the entry of the interlocutory decree; that on June 2, 1950, before any final decree had been entered in said divorce suit, defendant and the decedent, John L. Kelley, both of whom were then living in Oregon, were married at Stevenson, Washington, and after the marriage ceremony returned to Oregon where they lived as man and wife until the death of Kelley; that no other marriage ceremony was performed between defendant and Kelley; that on September 8, 1950, upon motion of the defendant, a final decree of divorce was entered in the Gehri suit; that on August 14, 1952, Kelley died in Multnomah county; that on August 29, 1952, upon the application of Alvin Earle Gehri, the Superior Court of Pierce county entered an amended final decree of divorce in the suit referred to above, which amended decree was entered nunc pro tunc as of September 19, 1949; that on September 3, 1952, defendant was appointed administratrix of the estate of the decedent, qualified, and has since acted in that capacity; that prior to his marriage with defendant, Kelley had made a will leaving all his property to his sons and had neither changed said will nor executed a new one after his marriage to defendant.

Plaintiffs filed a petition for the removal of defendant as administratrix on the ground that she was

not the widow of decedent and on the same day also filed a petition for determination of heirship under ORS 117.510 to 117.560. The circuit court denied the petition for the removal of defendant as administratrix and entered an order determining that the heirs of the decedent, John L. Kelley, were his widow, the defendant, Ruth M. Kelley and his two sons. From these orders the plaintiffs have appealed.

■ The principal question for determination is whether the entry on August 29, 1952, of a final decree of divorce between Gehri and defendant by the Superior Court of Washington nunc pro tunc as of September 19, 1949, pursuant to the provisions of § 26.08.230, Revised Code of Washington, validated the marriage on June 2, 1950 of defendant and the decedent, John L. Kelley. If the marriage was valid, it revoked the will executed by decedent prior to such marriage.

In *Huard v. McTeigh*, 113 Or 279, 287, 232 P 658, this court, in holding invalid a marriage entered into in British Columbia in violation of a Washington divorce decree, which provided that neither party should marry for six months from the entry of said decree, stated the applicable general rules in the following language:

"The general rule, for which we take it no authorities need be cited, is that a marriage valid where solemnized is valid everywhere. The converse of this rule, however, is more applicable to the case at bar: A marriage invalid where solemnized is invalid everywhere: Hutchins v. Kimmell, 31 Mich. 126 (18 Am. Rep. 164); People v. Shaw, 259 Ill. 544 (102 N.E. 1031, L. R. A. 1915E, 87). The legality of a marriage must be determined by the laws of the state in which the marriage is consummated: Ollschlager's Estate v. Widmer, 55 Or. 154

(105 Pac. 717); Sturgis v. Sturgis, 51 Or. 16 (93 Pac. 696, 131 Am. St. Rep. 724, 15 L. R. A. (N.S.) 1034); Nelson v. Carlson, 48 Wash. 651 (94 Pac. 477.) If it be conceded that this marriage is invalid in British Columbia, where the same was solemnized, and invalid in Washington, the domicile of the plaintiff and the defendant, then, if the above rule be sound law, why is it not invalid in Oregon? * * *."

■ The Supreme Court of Washington has consistently held that an interlocutory decree does not dissolve the marriage and until a final decree of divorce is entered the marital relation has not been severed. See Lewis v. Department of Labor and Industries, 190 Wash 620, 70 P2d 298, and cases therein cited.

Section 26.04.020, Revised Code of Washington provides in part as follows:

"Marriages in the following cases are prohibited:

"(1) When either party thereto has a wife or husband living at the time of such marriage.

"* * * * *."

■ The Washington Supreme Court has uniformly held that marriages entered into in violation of the above statute are void ab initio. Beyerle v. Bartsch, 111 Wash 287, 190 P 239, Barker v. Barker, 31 Wash2d 506, 197 P2d 439 and In re Gallagher's Estate, 35 Wash2d 512, 213 P2d 621.

■ The fact that respondent and Kelley continued to live together as husband and wife after the entry of the final decree of divorce on September 8, 1950, when a valid marriage could have been solemnized, did not legalize the ceremonial marriage which had been entered into by them at Stevenson on June 2, 1950 in

violation of the above Washington statute. *Lewis v. Department of Labor and Industries,* supra.

From the admitted facts and the above authorities it is obvious that unless the marriage of defendant to Kelley was validated by the entry on August 29, 1952 of a final decree of divorce in the Gehri suit nunc pro tunc as of September 19, 1949, defendant is not the widow of decedent and is not entitled to share in his estate. The nunc pro tunc decree was entered pursuant to the provisions of § 26.08.230, Revised Code of Washington, which reads as follows:

"Whenever either of the parties in a divorce action is, under the law, entitled to a final judgment, but by mistake, negligence, or inadvertence the same has not been signed, filed, or entered, if no appeal has been taken from the interlocutory order or motion for a new trial made, the court, on the motion of either party thereto or upon its own motion, may cause a final judgment to be signed, dated, filed, and entered therein granting the divorce as of the date when the same could have been given or made by the court if applied for. The court may cause such final judgment to be signed, dated, filed, and entered *nunc pro tunc* as aforesaid, even though a final judgment may have been previously entered where by mistake, negligence, or inadvertence the same has not been signed, filed, or entered as soon as it could have been entered under the law if applied for. Upon the filing of such final judgment, the parties to such action shall be deemed to have been restored to the status of single persons as of the date affixed to such judgment, and any marriage of either of such parties subsequent to six months after the granting of the interlocutory order as shown by the minutes of the court, and after the final judgment could have been entered under the law if applied for, shall be valid for all purposes as of the date affixed to such final judg-

ment, upon the filing thereof. [1949 c 135 § 1; Rem. Supp. 1949 § 988-4].''

The above statute was enacted by chapter 135, Laws of Washington 1949 and was in effect when the ceremonial marriage was entered into by defendant and Kelley at Stevenson on June 2, 1950.

■ Except for minor immaterial exceptions, the above statute is an exact copy of § 133 of the California Civil Code. The Washington legislature having adopted the California statute, is normally presumed to have adopted the construction theretofore placed upon the statute by the courts of California. *Washington Escrow Co. v. McKinnon,* 40 Wash2d 432, 243 P2d 1044.

Prior to the adoption of the statute in Washington in 1949, the California District Courts of Appeal on several occasions had construed the statute. *Macedo v. Macedo,* 29 Cal App2d 387, 84 P2d 552, *Ringel v. Superior Court,* 54 Cal App2d 34, 128 P2d 558, *In re Hughes' Estate,* 80 Cal App2d 550, 182 P2d 253, *Armstrong v. Armstrong,* 85 Cal App2d 482, 193 P2d 495.

From the opinion in *In re Hughes' Estate,* supra, we quote the following:

"It was held in Macedo v. Macedo, 29 Cal. App. 2d 387, [84 P. 2d 552], that section 133 was intended to be retroactive; that it is both remedial and curative; that it violates no constitutional restriction, and that the entry of a final decree *nunc pro tunc* as of the date when a final decree could first have been lawfully entered was effective, by virtue of the section, to validate a marriage contracted more than one year after the entry of an interlocutory decree and before the entry of a final decree."

The historical background and the reasons for the enactment of the California statute are set out in *Macedo v. Macedo,* supra, and we assume that a similar

background and like reasons persuaded the Washington legislature to adopt the California statute.

■ In view of the interpretation placed upon the California statute by the courts of that state and presumably adopted by the Washington legislature in enacting RCW 26.08.230, we are satisfied that the entry on August 29, 1952 of the final decree in the Gehri divorce suit nunc pro tunc as of September 19, 1949, validated the marriage of defendant and Kelley unless such a result was prevented by the intervening death of Kelley on August 14, 1952.

In the case of *In re Hughes' Estate,* supra, the California court considered the effect of the death of one of the parties to a divorce action upon the power of the court to enter a final judgment nunc pro tunc. The question to be decided was stated by the court in the following language:

"The *nunc pro tunc* judgment upon which appellant relies was effective to validate her marriage, unless the death of Mr. Hughes deprived the court of the power to enter it. Whether such power existed depends upon the effect to be given to sections 132 and 133. * * *"

The material portion of section 132 of the civil code referred to in the above quotation provided that the death of either party after the entry of the interlocutory decree did not impair the power of the court to enter a final judgment. In determining the effect of these two sections, the court said:

"* * * The argument of respondents ignores the effect of section 133, which was enacted for the purpose of avoiding conditions due to the inadequacy of section 132. The purpose was to validate otherwise void marriages and thus relieve the parties to such marriages from the stigma and other consequences of bigamous relationships into which they might innocently fall by reason of oversight

or neglect to have a final decree entered. Mere entry of the *nunc pro tunc* judgment acts retroactively to restore them to the status of single persons and at the same time gives them and their later acquired spouses legal married status. It is all strictly artificial, but so is the semidivorced status occupied by the holders of an interlocutory decree. The purpose of the law is not satisfied by the death of one of the parties prior to the entry of a *nunc pro tunc* judgment. True, death severs the marital relationship, but it severs it only as of the date of death, while the statute is designed to accomplish more than this. A final judgment, in usual form, dissolves the marriage as of the date of entry of the judgment. That is sufficient where other rights are not involved. Section 133 was enacted for the protection of such other rights and provides that even though a marriage has been dissolved by a final judgment, a *nunc pro tunc* judgment may be entered thereafter to accomplish the further purpose of validating otherwise invalid marriages. Section 132 gives the court authority to enter a final judgment after the death of either party. The two sections must be read together. While before the adoption of section 133 a final judgment entered after the death of either of the parties did not have the effect of validating an invalid marriage, the two sections read together now authorize the entry of a *nunc pro tunc* judgment after the death of either of the parties, and such judgment has the effect declared by section 133. Certainly if Mr. Hughes' first wife, Genevieve, had remarried before entry of a final judgment, the death of Mr. Hughes would not have deprived her of the right to have a *nunc pro tunc* judgment entered for the purpose of validating her marriage. To allow his death to deprive appellant of all rights under section 133 would unjustifiably and unreasonably limit the scope of that section. It seeks to accomplish a beneficient purpose and the court should give it a construction as broad as its pur-

pose appears to be. We hold, therefore, that appellant's marriage to Mr. Hughes was validated by the *nunc pro tunc* judgment.''

In *Hamrick v. Hamrick,* 119 Cal App2d 839, 260 P2d 188, it was also held that a decree of divorce entered nunc pro tunc after the death of John Hamrick validated an otherwise void marriage entered into by him prior to the entry of a final decree. The court quoted with approval and followed both *Macedo v. Macedo,* supra, and *In re Hughes' Estate,* supra.

■ In their brief, the appellants have properly pointed out that although Washington has adopted the provisions of section 133 of the California Civil Code, it does not have a statute similar to the section 132 referred to in the decision quoted from above. That is not material in the case at bar, however, because Kelley was not a party to the divorce suit between Alvin Earle Gehri and the defendant. It is a general rule, as stated in 1 Am Jur 83, Abatement § 110, that a suit for divorce abates upon the death of one of the parties thereto, but since Kelley was not a party to the Gehri divorce suit, his death did not abate that suit. Since both parties to the Gehri divorce suit were still living on August 29, 1952, the Washington court had authority under RCW 26.08.230 to enter on that date an amended final decree nunc pro tunc as of September 19, 1949.

If the marriage to Kelley could have been validated at any time before his death by the entry of a decree in the Gehri divorce suit, we see no reason why the marriage should not be validated by the entry of a nunc pro tunc decree after Kelley's death, so long as there is no impairment of vested rights of third parties.

■■ Although the validity of the marriage should be determined by the law of Washington, we believe

that in deciding the conflicting claims of the plaintiffs and the defendant to the property of the decedent situated in Oregon, we should adopt a finding in harmony with the settled law and policy of this state. In our opinion, the finding of the circuit court holding valid the marriage of defendant to John L. Kelley was in harmony with such law and public policy.

In *Wadsworth v. Brigham et al.,* 125 Or 428, 259 P 299, 266 P 875, the plaintiff, Mercedes E. Wadsworth, brought a suit in the circuit court of Multnomah county alleging that she was the daughter and sole heir of John H. Brigham and that her father had died leaving a will in which she was not mentioned and that she was therefore entitled to inherit as against all of the beneficiaries named in the will, some of whom were collateral kindred. Mercedes contended that her mother, Emily E. Liddy, and the decedent, John R. Brigham, had lived together as husband and wife in Oregon for more than one year and that she was born on October 13, 1879 as a result of such cohabitation. There was no evidence that her parents had ever been married and since common law marriages have never been recognized in this state, Mercedes' rights, if any, depended solely upon the construction of Chapter 269, Oregon Laws 1925, which read as follows:

"Section 1. In case a man and a woman, not otherwise married heretofore, shall have cohabited in the state of Oregon as husband and wife, for over one year, and children shall be living as a result of said relation, said cohabitation, if children are living, is hereby declared to constitute a valid marriage and the children born after the beginning of said cohabitation are hereby declared to be the legitimate offspring of said marriage."

Shortly after Mercedes was born, John R. Brigham deserted Emily E. Liddy who was thereafter twice

married and died some years prior to 1925. John R. Brigham died on June 12, 1925, about 15 days after Chapter 269, Oregon Laws 1925 became effective. It thus appears that when the case was originally decided by this court in September, 1927, Mercedes was about 48 years of age, her parents were both dead, one before and one after the enactment of the statute, and Mercedes was asking this court to decree that the curative statute of 1925 was effective to unite her parents in marriage as of October 13, 1879, to legitimatize her birth and permit her to inherit the property of her father instead of the beneficiaries named in his will. In granting Mercedes the relief prayed for in her petition, this court, among other things, said:

"At the outset we wish to lay down the following general rule for the construction of remedial statutes:

" 'In accordance with the general rule that remedial statutes should be given a liberal construction, they will be freely construed to have a restrospective operation whenever such seems to have been the intention of the legislature, unless such construction would impair the validity of contracts, disturb vested rights, or create new obligations. This principle has been applied to statutes for the prevention of fraud, legitimating the issue of void marriages.' 36 Cyc. 1209.

"The general construction of such statutes is retrospective. In 7 C.J. 948, it is said:

" 'Statutes intended to legitimate the issue of a marriage otherwise void are remedial in their nature and may properly be applied retrospectively.'

"A very leading case is Goshen v. Stonington, 4 Conn. 209, 221 (10 Am. Dec. 121). State v. Adams, 65 N. C. 537; Andrews v. Page, 50 Tenn. (3 Heisk.) 653.

"In Goshen v. Stonington, supra, the court said:

" 'Lastly, the defendants have insisted (and on this objection the principal stress has been laid), that the law of May, 1820, being retrospective, and in violation of vested rights, it is the duty of the court to pronounce it void. The retrospection of the act is indisputable, and equally so is its purpose to change the legal rights of the litigating parties. Whether in so doing this, there has been injustice, will be an inquiry in a subsequent part of my opinion. It is universally admitted and unsusceptible of dispute, that there may be retrospective laws impairing vested rights, which are unjust, neither according with sound legislation, nor the fundamental principles of 'the social compact.' If, for example, the legislature should enact a law, without any assignable reason, taking from A his estate, and giving it to B the injustice would be flagrant, and the act would produce a sensation of universal insecurity. On the other hand, laws of a retrospective nature, affecting the rights of individuals, not adverse to equitable principles, and highly promotive of the general good, have often been passed, and as often approved. In the case before us, the defendants have expressly conceded, that the law in question is valid, so far as respects the persons de facto married, and their issue. But, in that event, would it not have been a retrospective operation on vested rights? The man and woman were unmarried, notwithstanding the formal ceremony which passed between them, and free, in point of law, to live in celibacy, or contract matrimony with any person at pleasure. It is a strong exercise of power to compel two persons to marry without their consent; and a palpable perversion of strict legal right. At the same time, the retrospective law, thus far directly operating on vested rights, is admitted to

be unquestionably valid, because it is manifestly just.'

"This language is also quoted in Cooley's Constitutional Limitations (7 ed.), page 533.

"Such statutes have been construed to apply to children whose parents were dead at the time of the passage of the act: Gregley v. Jackson, 38 Ark. 487; Wallace v. Godfrey, 42 Fed. 812; Jackson v. Lervey, 5 Cow. (N. Y.) 403.

"In Jackson v. Lervey, 5 Cow. (N. Y.) 397, 403, the court said:

" 'The act declares, that all marriages contracted, or which may thereafter be contracted, wherein one of the parties was, or might be slaves, shall be considered equally valid as though the parties thereunto were free, and the child or children of such marriages shall be deemed legitimate. The words are general, and extend to all marriages. Why should it be restricted to cases where the parties were then living? One object was to render the children legitimate. What superior claims had the children of parents then living to the interference of the legislature, to those whose parents were dead when the statute was enacted? I perceive none. The words of the act are sufficiently broad to include both; and ought so to be construed to effectuate the intent. If I am right in this construction, then the child of the soldier was legitimate, and became the heir of the father.'
" * * * * *.

"That retrospective legislation is not strange in Oregon is evidenced by the many statutes found in the index of the Oregon Code making valid many defects in prior proceedings, such as divorce, defects in conveyances of land, marriages and such other matters. * * *."

Since the above case was decided the legislature has on six occasions enacted curative statutes to validate marriages void because entered into in violation of

ORS 107.110, which provides, in part, that neither party to a divorce "shall be capable of contracting marriage with a third person until the expiration of six months from the date of the decree." In addition, curative statutes to validate marriages void for other reasons were enacted in 1945 and 1955. See Chapter 118, Oregon Laws 1945 and Chapters 72 and 694, Oregon Laws 1955. All of these curative statutes are retrospective in operation. It is thus clear that the orders of the circuit court giving effect to the nunc pro tunc decree entered by the Washington court pursuant to the curative statute enacted by our sister state, RCW 26.08.230, is in conformity with the public policy of this state as evidenced by the many curative statutes enacted by our legislature.

█ In our opinion, the interest acquired by the plaintiffs in their father's estate upon his death was not the kind of vested right protected from the entry of a nunc pro tunc decree. The applicable rule is stated in 1 Freeman on Judgments (5th ed) 262, § 1238, as follows:

"* * * The expression so frequently made that a nunc pro tunc entry is not to affect the rights of third persons must not be understood as signifying that effect must be denied to such an entry in all cases where third persons have acquired interests. Courts in determining whether or not to amend or perfect their records are controlled by considerations of equity. If one not a party to the action has, when without notice of the rendition of the judgment or of facts from which such notice must be imputed to him, advanced or paid money or property, or in other words, has become a purchaser or encumbrancer in good faith and upon a valuable consideration, then the subsequent entry of such judgment nunc pro tunc will not be allowed to prejudice him. Otherwise its effect against him

is the same as if it had been entered at the proper time. Thus a woman whose dower right has been enlarged by statute passed after the confession of judgment by her husband is not an intervening party against whose rights the judgment cannot thereafter be entered nunc pro tunc. * * *''

In support of the last sentence of the above text, the author cites *Davidson v. Richardson*, 50 Or 323, 89 P 742, 91 P 1080, wherein this court said:

"Plaintiff's interest in the land on December 5, 1898, the date of the entry of the judgment, was not such as to make her an intervening party within the meaning of the law. Her inchoate right of dower was increased by the legislative act, but she did not act upon conditions then existing, nor did she pay value or otherwise change her condition upon faith in the record, but was only a possible beneficiary under the statute. We understand that, to be protected from the effect of the nunc pro tunc entry, plaintiff must have been in the position of a bona fide purchaser for value: Freeman, Judgments (3 ed.), §§ 66, 67; Leonard v. Broughton, 120 Ind. 536 (22 N. E. 731; 16 Am. St. Rep. 347, 355)."

We have considered plaintiffs' contention that the Washington legislature intended that RCW 26.08.230 should operate retrospectively only to June 8, 1949, which contention is based upon the arrangement of Chapter 135, Washington Laws 1949 and Chapter 215, Washington Laws 1949, in the Revised Code of Washington. Although the statutes of Washington have been organized into a code, such code is only prima facie evidence of the law. The law must be determined from reading the statutes and when so considered, Chapter 215 does not limit the retrospective operation of Chapter 135.

The orders of the circuit court are affirmed.