Argued July 23, reversed September 10, petition for review
denied November 20, 1973

IN THE MATTER OF THE ADOPTION OF MONIQUE BIGGS,
A MINOR CHILD

FRANKLIN ET UX, *Respondents, v.* BIGGS,
*Appellant.*

IN THE MATTER OF THE ADOPTION OF MICHELLE BIGGS,
A MINOR CHILD

FRANKLIN ET UX, *Respondents, v.* BIGGS,
*Appellant.*

513 P2d 1216

*Douglas W. Daughtry,* Lincoln City, argued the cause for appellant. With him on the brief were Bennett, Gates & Daughtry, Lincoln City.

*James H. Lewelling,* Newport, argued the cause and filed the brief for respondents.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

THORNTON, J.

This is an appeal by the natural mother seeking to set aside the decrees of the circuit court permitting petitioners to adopt her twin daughters. Both petitions for adoption were consolidated at trial and on this appeal. Jurisdiction was sought under ORS 109.326,[1] petitioners alleging that the natural mother had given her written consent[2] for the adoption and that she is

---

[1] ORS 109.326 provides:

"(1) The consent of the mother of the child is sufficient, and for the purpose of giving such consent the mother of the child shall be deemed to have arrived at the age of majority and for all purposes relating to the adoption of the child the father of the child shall be disregarded just as if he were dead, when it is shown in the court in which the adoption proceedings are pending that:

"(a) The mother of the child was unmarried at the time of the conception of the child to be adopted and remained unmarried at the time of the birth of the child and was not married to the father of the child at the time of her consent to the adoption or surrender of the child for the purpose of adoption under ORS 418.270 * * *

"* * * * *."

[2] The natural mother signed two formal consents on July 12, 1972. For purposes of clarity we will refer to these consents (one for each twin) as one consent.

unwed. There is nothing in the record to indicate that the natural father was served with any notice of the proceedings.

The natural mother filed a revocation of her consent and intervened in the proceedings, challenging the jurisdiction of the court. The trial court ruled that she was estopped to withdraw her consent and entered decrees granting the petitions for adoption of both minor children.

On appeal the natural mother alleges: (1) the trial court erred in finding that she was estopped to withdraw her consent and (2) notwithstanding a finding of estoppel, the court should have considered options available under the adoption laws other than granting the petitions for adoption.

■ Under our adoption laws, consent of the parents, guardian or other person in loco parentis (except under certain contingencies not involved here), is jurisdictional, and in the absence of such consent the court is without power to proceed. *Hughes v. Aetna Casualty Co.*, 234 Or 426, 435, 383 P2d 55 (1963); *Dugger et ux v. Lawless,* 216 Or 188, 194, 338 P2d 660 (1959); *Hessner et ux v. Bilyeu,* 210 Or 266, 268, 310 P2d 305 (1957); *Williams et ux. v. Capparelli,* 180 Or 41, 44, 175 P2d 153 (1946). If the court proceeds without the required consent "its decree will be a nullity, not voidable but void * * *." *Furgeson v. Jones,* 17 Or 204, 219, 20 P 842 (1888); *accord, In re Estate of Meyers,* 197 Or 520, 532, 254 P2d 227 (1953).

■ As already noted, jurisdiction to proceed with the adoptions was sought under ORS 109.326, which essentially provides that where the children to be adopted are illegitimate, the consent of the natural mother is required but that the natural "father of the

454

child shall be disregarded just as if he were dead."[9] The requirements for jurisdiction under ORS 109.326 are that the natural mother of the child (1) be "unmarried at the time of the conception of the child," (2) remain "unmarried at the time of the birth," (3) "not [be] married to the [natural] father * * * at the time of her consent" and (4) did in fact consent.

The essential facts are as follows:

The twins sought to be adopted by petitioners were born January 29, 1970, in French Camp, California, to Barbara Anne Biggs and Virgil John Biggs. There is a conflict in the record as to the marital status of the natural parents. The mother testified that she was married to Virgil John Biggs in Nogales, Mexico, on February 14, 1969; that she and Mr. Biggs signed a certificate, paid the required fee, were married in a civil ceremony and thereafter considered themselves (and held themselves out as) husband and wife. However, Mrs. Biggs did not produce a marriage certificate and she further testified she had been informed by officials in Nogales that they did not have a record of the marriage.

The record, on the other hand, reveals several documents (including the consent to adoption and withdrawal of consent) executed by Mrs. Biggs which

---

[9] We note that in Stanley v. Illinois, 405 US 645, 92 S Ct 1208, 31 L Ed 2d 551 (1972), the United States Supreme Court held unconstitutional a state statute containing a provision similar to that in ORS 109.326 denying parental rights to the father of an illegitimate child. To the same effect, see, Rothstein v. Lutheran Social Services of Wisconsin and Upper Michigan, 405 US 1051, 92 S Ct 1488, 31 L Ed 2d 786 (1972); Vanderlaan v. Vanderlaan, 405 US 1051, 92 S Ct 1488, 31 L Ed 2d 787 (1972); Peo. ex rel. Slawek v. Covenant Child. Home, 52 Ill2d 20, 284 NE2d 291 (1972); In re Guardianship of Harp, 6 Wash App 701, 495 P2d 1059, review denied 80 Wash2d 1010 (1972).

state that she was unmarried at the time of the birth of the twins. At trial she sought to explain this inconsistency saying that she had always considered herself married, but that by the time she executed the above documents, she had become uncertain of the validity of her marriage. It had been indicated to her, apparently by an unidentified welfare caseworker, that she probably was not married. In all her transactions with public welfare in Oregon, Arizona and California, she identified herself as Mrs. Biggs, considering herself married to Virgil John Biggs, the natural father of the twins.

Further evidence reveals that the couple continued to live together until they separated in the fall of 1971. Thereafter, in November 1971, Mrs. Biggs moved to Newport, Oregon, with her children, where she received aid to dependent children (she has four children). Acting on the advice of a welfare caseworker, Mrs. Biggs placed two of the children (the twins) in a foster home. In December 1971 her landlady told Mrs. Biggs of a couple who would be willing to take the twins into their home and care for them. The landlady made the arrangements for placing the twins with petitioners, since the couple wished to remain anonymous.

Mrs. Biggs released the twins to petitioners on December 7, 1971. She also delivered the following document, which appears in her own handwriting:

"Dec. 7th 1971

"To whom it may concern,
    "This is a letter of consent for Mr & Mrs ———— to care for and raise as their own children, Michelle and Monique Biggs—twins born Jan 29th, 1970. Any medical care, surgery or medication as to be

determined by a physician is to be given them with my full consent by the above named couple. They are in fact to be regarded as parents to Michelle and Monique Biggs. I also consent to the use of their last names for the twins in raising them as their own children.

"Mrs. Barbara Anne (Leo) Biggs"

Mrs. Biggs testified that she knowingly and freely executed the above document, but that she had not considered it to be anything more than an authorization for medical treatment. In answer to a question whether she intended the above document to be consent for an adoption, Mrs. Biggs said:

"No, not for an adoption proceeding. I had already been informed by one of their attorneys that an adoption was out of the question."

Subsequent to this (the record does not establish how soon thereafter) Mrs. Biggs received $200 from her landlady, which Mrs. Biggs testified came from the petitioners, and that she executed a receipt. The alleged receipt was not produced, although the payment of the money was neither denied nor challenged. Mrs. Biggs testified that it was her understanding that she was to use the money to leave the state.

After receiving the $200 Mrs. Biggs left Newport with her two remaining children and moved to Tucson, Arizona, in December 1971. The twins remained with petitioners, with whom they have continued to reside. Unsuccessful in her attempts to obtain employment and to regain custody of her twins, Mrs. Biggs returned to Newport in the latter part of June 1972.

On her return, Mrs. Biggs sought the assistance of the Children's Services Division in Lincoln County.

Mrs. Biggs testified that she was told to retain an attorney—something which she had no funds to do. Upon further inquiry, she was informed by the district attorney's office that legal aid services were not available in the county.

Mrs. Biggs, believing that she had no one to turn to for advice or help, contacted the attorney representing petitioners. Testimony concerning the contact between Mrs. Biggs and petitioners' attorney does not reveal in detail what transpired other than a general discussion of the matter of adoption of Mrs. Biggs' twins. The result of this contact was that Mrs. Biggs signed the consent, dated July 12, 1972.

The petitions to adopt the twins were originally filed on June 29, 1972 (prior to consent). Amended petitions were filed on July 14, 1972 (with Mrs. Biggs' July 12 consent attached). On August 4, 1972, the court appointed counsel to represent Mrs. Biggs.[4] On September 15, 1972, Mrs. Biggs filed a petition to intervene in the adoption proceedings together with a formal withdrawal of consent.

As previously stated, the record reveals a conflict on the question of whether the natural parents were married. The court below, stating that it could not take judicial notice of the laws of Mexico where the alleged marriage took place, ruled that Mrs. Biggs was unmarried.

The trial judge's ruling apparently was based on (1) the failure of the natural mother to produce a marriage certificate, and (2) the lack of evidence of cohabitation in a jurisdiction where a common-law marriage is recognized.

---

[4] The record does not indicate when or how Mrs. Biggs learned that an attorney could be appointed for her by the court.

■ ■ ORS 41.360 (30) provides in effect that evidence that a couple openly cohabited and held themselves out as husband and wife raises a presumption they are married. The burden is on the party challenging the marriage to disprove, by the most cogent and satisfactory evidence, the validity of the marriage. *Ollschlager's Estate v. Widmer,* 55 Or 145, 105 P 717 (1909). This presumption will not be overcome by the failure to produce a valid marriage certificate. *Ollschlager's Estate v. Widmer,* supra. Furthermore, it is the public policy of this state "that the marriage relation be protected, and every reasonable doubt should be resolved in favor of a valid marriage." *Ashford v. Ashford,* 201 Or 206, 223, 249 P2d 968, 268 P2d 382 (1954). *See also, Edgren v. Reissner,* 239 Or 212, 396 P2d 564 (1964), an alienation of affections suit, where, under similar circumstances (except that a Tijuana marriage certificate was produced), the court allowed testimony of the parties to establish their Mexican marriage.

■ Notwithstanding the inconsistencies, the sworn testimony of Barbara Biggs that she and Virgil John Biggs have openly cohabited and held themselves out as husband and wife since February 14, 1969, raised the presumption that they were married. ORS 41.360 (30). The only matters in the record which tend to rebut the presumption of marriage are the statements to the contrary contained in the consent and withdrawal of consent. In light of Mrs. Biggs' explanation of this conflict, it was incumbent upon the court to make a thorough inquiry before ruling. This was not done. We conclude therefore that the evidence does not support the court's finding that the natural mother was unmarried to the father of the twins. This fact alone would require that we set aside the decrees.

Further we hold that Mrs. Biggs' withdrawal of her consent was and is valid, and that the court was without jurisdiction to proceed with the adoptions for this reason as well.

### The Consent of July 12, 1972

On July 12, 1972, the natural mother, Mrs. Biggs, signed formal consent to the adoption of her twin daughters by petitioners. This consent was formally withdrawn on September 15, 1972.[9]

In *Williams et ux. v. Capparelli*, 180 Or 41, 175 P2d 153 (1946), our Supreme Court held that the natural parent may withdraw consent to an adoption at any time prior to the entry of a decree. However, in *Dugger et ux v. Lauless*, 216 Or 188, 338 P2d 660 (1959), the court qualified its prior holding in *Capparelli*, saying that under certain circumstances the natural parent may be estopped to withdraw his consent. Several factors relevant to estoppel are set out in *Dugger*, which include,

"* * *'* * * the circumstances under which the consent was given * * *.' " *Dugger* at 198.

Mrs. Biggs' consent of July 12 was given after a baffling and frustrating attempt by her to regain custody of her two children. As already noted, she testified that she could not afford to employ an attorney and was told by the district attorney's office that legal aid service was not available in the county. No contrary evidence was offered. These circumstances, together with the factors that Mrs. Biggs was alone, had no one to turn to for advice, was impover-

---

[9] The formal withdrawal alleged that a letter communicating withdrawal of consent was sent to the Children's Services Division on August 16, 1972. Such letter is not in the record.

ished and on public welfare, are relevant to Mrs. Biggs' frame of mind when she contacted petitioners' attorney and eventually signed the written consent of July 12.⑥ It is also important to note that when Mrs. Biggs did obtain legal assistance, she affirmatively withdrew her prior consent.

The record indicates that Mrs. Biggs initiated the contact with petitioners' attorney; however the details, other than a general discussion of the adoption, do not appear in the record. The record does indicate that the only legal advice which Mrs. Biggs received before she signed the July 12 consent came from petitioners' attorney.

■ In the absence of further evidence as to what advice, if any, was given, this fact raises a serious question as to the validity of the consent signed on July 12.⑦ In any event she immediately withdrew her consent after the court appointed counsel to represent her. We hold that the record does not support a finding of estoppel to withdraw, on September 15, the July 12 consent. *See, Dugger et ux v. Lawless,* supra; *Hessner et ux v. Bilyeu,* 210 Or 266, 310 P2d 305 (1957).

### The Note of December 7, 1971

Petitioners contend that even if the consent of July 12, 1972 was effectively withdrawn, the Decem-

---

⑥ Mrs. Biggs testified that she signed the July 12 consent voluntarily and that she knew what she was signing; that she signed only because she was despondent and did not know what else to do.

⑦ As to the obligations of an attorney in dealing with an opposing party who is not represented by an attorney, *see,* Oregon State Bar, Code of Professional Responsibility, Canon 7, DR 7-104; Rules of Professional Conduct, Rule 11; Opinions of Committee on Legal Ethics, Op. No. 47, June 28, 1957.

ber 7, 1971 note conveys Mrs. Biggs' consent to the adoption of her twin daughters. Mrs. Biggs claims that this note was merely a consent for medical treatment and not a consent for adoption.

■ We need not decide whether Mrs. Biggs is estopped to withdraw any consent her note of December 7, 1971 might contain, nor whether the note constitutes consent in the first instance. The record reveals that Mrs. Biggs was paid $200 shortly after she released her twins to petitioners. Mrs. Biggs testified that the money came from petitioners, although her landlady actually delivered it. Mrs. Biggs further testified it was her understanding that she was to use the money to leave the state. There was no objection to this evidence, nor was there any attempt by petitioners to refute the matter. The payment of this money to Mrs. Biggs vitiates any consent that may have been contained in the note of December 7, 1971. *Downs et al. v. Wortman et al.*, 228 Ga 315, 185 SE2d 387 (1971); *Barwin v. Reidy*, 62 NM 183, 307 P2d 175 (1957) ($800 payment vitiated consent for adoption).

In *Downs et al. v. Wortman et al.*, supra (habeas corpus), the natural mother signed an adoption agreement in return for her plane fare out of the state. The court said such agreement is void as against public policy; therefore the consent was not freely and voluntarily given and could be withdrawn. 228 Ga at 315, 185 SE2d at 388. *See also, Fox et ux v. Lasley*, 212 Or 80, 318 P2d 933 (1957), where the court said that "an agreement by a parent to relinquish custody of his child is against public policy." 212 Or at 93; *accord, Schultz v. First Nat. Bk. of Portland et al*, 220 Or 350, 359, 348 P2d 22 (1960); *Smith v. Green*, 4 Or App 533, 540, 480 P2d 437 (1971).

Therefore we conclude: (1) the withdrawal of consent by Mrs. Biggs was valid; (2) the court was without jurisdiction under ORS 109.326 to proceed; and (3) the decrees of adoption are void. *Furgeson v. Jones,* 17 Or 204, 219, 20 P 842 (1888); *accord, In re Estate of Meyers,* 197 Or 520, 532, 254 P2d 227 (1953).

In light of the above it is not necessary to examine the second allegation of error.

Reversed.