[Civ. No. 15224.   First Dist., Div. Two.   Aug. 24, 1953.]

AGNES HAMRICK, Appellant, v. JOHN FORREST HAM-
RICK, Defendant; JO MAE HAMRICK, Respondent.

W. I. Follett, Evelyn B. Follett and Stanley C. Small-wood for Appellant.

Robert T. Allen for Respondent.

GOODELL, J.—This appeal was taken from an order entered on August 14, 1951, which directed that a final judgment of divorce entered on July 13, 1950, should be signed, dated, filed, and entered, *nunc pro tunc*, as of July 6, 1950.

On February 11, 1946, appellant Agnes Hamrick married John Forrest Hamrick in the State of Washington, and a son Russell D. Hamrick, was born to them. On June 21, 1949, she sued for divorce on the ground of extreme cruelty. On July 5, 1949, an interlocutory judgment was granted to her awarding her $60 a month alimony and $90 a month for their one year old son, Russell.

When the time drew near for the final judgment, Agnes was in the State of Washington and she there made the requisite affidavit, which was presented to the court on July 13, 1950, whereupon the final judgment of divorce was entered on the 13th at her instance.

On the day before, however, defendant Hamrick, a lieutenant in the Marine Corps, married respondent Jo Mae Hamrick in Vallejo. On September 25, 1950, he was killed in action in Korea. The marriage on the day before the entry of the final judgment gave rise to this litigation.

On April 4, 1951, respondent initiated proceedings to obtain the *nunc pro tunc* entry of appellant's final judgment (theretofore entered) to a time antedating her marriage to Lieutenant Hamrick. The final judgment could have been entered on July 6, 1950 (six days before the marriage) and the court on respondent's motion dated it back to that day.

The importance of the question presented on this appeal is obvious and need not be stressed.

Appellant has five distinct contentions herein.

*First*: That respondent Jo Mae Hamrick "was not a proper person to make the motion for the re-entry of the final decree *nunc pro tunc*" since she was not a party to the divorce proceeding.

In 1903 the Legislature enacted section 132 of the Civil Code which read, and still reads, as follows: "When one year has expired after the entry of such interlocutory judgment, the court on motion of either party, or upon its own motion, may enter the final judgment granting the divorce, and such final judgment shall restore them to the status of single persons, and permit either to marry after the entry thereof; and such other and further relief as may be necessary to complete disposition of the action, but if any appeal is taken from the interlocutory judgment or motion for a new

trial made, final judgment shall not be entered until such motion or appeal has been finally disposed of, nor then, if the motion has been granted or judgment reversed. *The death of either party after the entry of the interlocutory judgment does not impair the power of the court to enter final judgment as hereinbefore provided; but such entry shall not validate any marriage contracted by either party before the entry of such final judgment, nor constitute any defense of any criminal prosecution made against either.''* (Emphasis added.)

The first sentence provides for the ordinary case, where both parties are living at the end of the interlocutory period, the language being that ''the court on motion of either party, or upon its own motion, may enter the final judgment . . .'' The second sentence, which we have emphasized, provides for an altogether different situation. No language is to be found therein circumscribing the moving party or parties, for obviously after the death of one or both of the parties the language of the first sentence respecting motions would be wholly inappropriate. The second sentence comes out flatly and says that death shall not impair the *power* of the court. The Legislature could not be expected to have foreseen the numerous and various situations where relatives, or perhaps even strangers in blood, would find it to their interest to have such judgment entered after the death of one or both of the parties, and so it would seem that the Legislature wisely left it that way.

Section 132, however, makes no provision for *nunc pro tunc* entry (see *Corbett* v. *Corbett,* 113 Cal.App. 595 [298 P. 819], and discussion in *Macedo* v. *Macedo,* 29 Cal.App.2d 387, 390 [84 P.2d 552]) and in 1935 the Legislature enacted section 133, Civil Code, which at the time of respondent's motion read as follows:

''Whenever either of the parties in a divorce action is, under the law, entitled to a final judgment, but by mistake, negligence or inadvertence the same has not been signed, filed or entered, if no appeal has been taken from the interlocutory judgment or motion for a new trial made, the court, *on the motion of either party thereto or upon its own motion,* may cause a final judgment to be signed, dated, filed and entered therein granting the divorce as of the date when the same could have been given or made by the court if applied for. The court may cause such final judgment to be signed, dated, filed and entered nunc pro tunc as aforesaid, *even though a*

*final judgment may have been previously entered* where by mistake, negligence or inadvertence the same has not been signd, filed or entered *as soon as it could have been entered under the law if applied for.* Upon the filing of such final judgment, the parties to such action shall be deemed to have been restored to the status of single persons as of the date affixed to such judgment, and *any marriage of either of such parties subsequent to one year after the granting of the interlocutory judgment as shown by the minutes of the court, and after the final judgment could have been entered under the law if applied for, shall be valid for all purposes as of the date affixed to such final judgment, upon the filing thereof.''* (Emphasis added.)

It must be borne in mind that the defendant did not apply for the entry of the final judgment; the appellant did so, and it was entered on July 13, 1950, while both parties to the action were living. That which the respondent sought was its entry as of July 6th instead of 13th. Such earlier entry meant a great deal to her and to her two sons by defendant. The procedure which she invoked was that prescribed in the second sentence of section 133, a final judgment having been previously entered, and she invoked it seven months after Lieutenant Hamrick's death. Section 132 gives the court the *power* to enter a final judgment after death. Section 133 gives the court the *power* to enter a final judgment *nunc pro tunc.* These sections must be read together (*Macedo* v. *Macedo, supra*; *Estate of Hughes,* 80 Cal.App.2d 550, 554 [182 P.2d 253]; 23 Cal.Jur. 785-788, §§ 163, 166). While it is true the first sentence of section 133 provides for *nunc pro tunc* entry ''on the motion of either party'' the second sentence (under which respondent presented her motion) contains no such language, and such language *in the case of a death* (which is the case here) would be just as inappropriate in section 133 as it would be in section 132.

In *Estate of Hughes, supra,* 80 Cal.App.2d 550, 553-554, the court said: ''The purpose was to validate otherwise void marriages and thus relieve the parties to such marriages from the stigma and other consequences of bigamous relationships into which they might innocently fall by reason of oversight or neglect to have a final decree entered. Mere entry of the *nunc pro tunc* judgment acts retroactively to restore them to the status of single persons and at the same time gives them and their later acquired spouses legal married status. It is all strictly artificial, but so is the semi-

divorced status occupied by the holders of an interlocutory decree. The purpose of the law is not satisfied by the death of one of the parties prior to the entry of a *nunc pro tunc* judgment. True, death severs the marital relationship, but it severs it only as of the date of death, while the statute is designed to accomplish more than this. A final judgment, in usual form, dissolves the marriage as of the date of entry of the judgment. That is sufficient where other rights are not involved. Section 133 was enacted for the protection of such other rights and provides that even though a marriage has been dissolved by a final judgment, a *nunc pro tunc* judgment may be entered thereafter to accomplish the further purpose of validating otherwise invalid marriages. Section 132 gives the court authority to enter a final judgment after the death of either party. The two sections must be read together.

■ While before the adoption of section 133 a final judgment entered after the death of either of the parties did not have the effect of validating an invalid marriage, the two sections read together now authorize the entry of a *nunc pro tunc* judgment after the death of either of the parties, and such judgment has the effect declared by section 133. Certainly if Mr. Hughes' first wife, Genevieve, had remarried before entry of a final judgment, the death of Mr. Hughes would not have deprived her of the right to have a *nunc pro tunc* judgment entered for the purpose of validating her marriage. To allow his death to deprive appellant of all rights under section 133 would unjustifiably and unreasonably limit the scope of that section. It seeks to accomplish a beneficent purpose and the court should give it a construction as broad as its purpose appears to be. We hold, therefore, that appellant's marriage to Mr. Hughes was validated by the *nunc pro tunc* judgment.''

■ When section 133 provides for a *nunc pro tunc* entry ''on the motion of either party'' it of course contemplates that both parties are living, or at least that the one interested in antedating the entry is living. But Lieutenant Hamrick at the time of the motion had been dead for seven months. Had he lived he certainly would have been a proper party to make the motion. The motion was made by ''Jo Mae Hamrick, wife of defendant, John Forrest Hamrick.'' The order refers to ''The motion of Jo Mae Hamrick *on behalf of defendant John Forrest Hamrick*'' (emphasis added). But be that as it may, it is certain that respondent was asserting in court a right based on and derived from the marriage ceremony per-

formed on July 12, 1950, between herself and Lieutenant Hamrick. She was avowedly appearing in court to assert and establish her status as his lawfully wedded wife, and her purpose was to clear away any possible claim or stigma of a bigamous marriage, and to establish, also, the rights of the two children of herself and Lieutenant Hamrick as his legal heirs. She was asserting no right other than the party himself could have asserted had he lived.

Indeed this identity of interest is virtually conceded by appellant in her brief, wherein she says:

"There are sound reasons for requiring that movant and respondent, who was not a party to the divorce action, identify herself with the interest of one of the parties before being permitted to ask for a *nunc pro tunc* decree of divorce, even when the request is that the Court act upon its own motion. The first reason is that this Court would hardly permit a complete stranger to the action or to the parties thereto, to make such an application, even when the application is that the Court act upon its own motion. Necessarily, any person requesting a final decree of divorce *nunc pro tunc* would have to show such relationship to at least one of the parties thereto, that some interest of the movant would be affected by the granting or refusal of the *nunc pro tunc* decree, as, for example, the situation in the present case, where a marriage of movant to one of the parties would be validated thereby."

If appellant's contention were to be upheld it would have to be on the ground that the court had no *power* to make the *nunc pro tunc* order simply because the motion therefor was not made by *a party to the action,* when, in this particular instance, the only party to the action who would have been concerned in having the marriage status of himself and his second wife established and validated could not, in the very nature of things, make the motion.

Since under section 132 the *power* of the court remains unimpaired to enter a final judgment of divorce after the death of either or both of the parties, and since sections 132 and 133 relate to the same subject and must be construed together (*Ebert* v. *State of California,* 33 Cal.2d 502, 509 [202 P.2d 1022]) we are satisfied that the court had the *power* under section 133 to make the *nunc pro tunc* entry as of July 6, 1950, on the motion of respondent, who, after all, was seeking only that to which Lieutenant Hamrick, the party defendant, would have been clearly entitled had he

lived, namely, the validation of their marital status as of July 12, 1950.

We might add that the Macedo case cited earlier was followed by this court in *Ringel* v. *Superior Court*, 54 Cal.App.2d 34 [128 P.2d 558] ; it was followed also in *Estate of Hughes, supra*; and it was again followed by this court in *Armstrong* v. *Armstrong*, 85 Cal.App.2d 482 [193 P.2d 495]. In all three cases the Supreme Court denied a hearing.

The Macedo case holds that the enactment of section 133 was "both curative and remedial" as to section 132 and *Estate of Hughes* (80 Cal.App.2d 550, 553 [182 P.2d 253]) says that section 133 "was enacted for the purpose of avoiding conditions due to the inadequacy of section 132."

*Appellant's second contention* is that the court did not order the *nunc pro tunc* entry on its own motion.

We must agree that such was the case. The form of order when tendered for signature recited: "The motion of Jo Mae Hamrick on behalf of defendant John Forrest Hamrick" and read: "Now therefore the above entitled court under the provisions of Civil Code Section 133 and on its own motion hereby orders" etc. The judge struck out the words "and on its own motion" and initialed the deletion. Although the order was not *sua sponte* we are satisfied, for the reasons already given, that the court had the power to make it on respondent's motion.

*Appellant's third contention* is that the defendant was in contempt of court when the final judgment was obtained, and that a party in contempt has no standing to apply for such judgment. We repeat that it was not the defendant who applied for the final judgment, but the appellant herself, who was the natural party to apply for it since she had been awarded the interlocutory judgment. What the respondent did was simply to move, some months after the appellant had obtained it, that its entry be set back seven days. Appellant, however, contends that respondent—whose rights are identified with Lieutenant Hamrick's rights according to appellant's own concession already noted—had no standing in court since defendant himself could not have obtained the final judgment because of his delinquency in payments. There was no reason for him to apply for the final, since appellant had already done so. Respondent in moving for its *nunc pro tunc* entry simply took things as she found them. For reasons of her own, appellant desired the final, and got it; it is the same judgment, granted on her motion, only dated back seven days.

Admittedly the defendant had made none of the payments required by the interlocutory judgment, and had he applied for the final judgment he might perhaps have been halted, but since he did not apply, the court was not faced with any problem of his default, and he had never been brought up on contempt proceedings. Appellant's action in taking the initiative relieved the defendant from making any exculpatory showing, and it cannot now be claimed for the first time that he was in contempt. The authorities cited by appellant under this heading are not in point.

■ *Appellant's fourth contention* is that the order appealed from permitted the second wife to profit by her own wrong.

The argument is made that respondent was instrumental in creating the situation which arose between husband and wife which resulted in the divorce and that equitable considerations (the doctrine of clean hands) bar any relief.

The only question before the court was whether or not respondent was entitled to the *nunc pro tunc* order. The matters relied on by appellant occurred long prior to the time of the motion. In *Boericke* v. *Weise*, 68 Cal.App.2d 407, 419 [156 P.2d 781], the court said: "Of course if a party comes into a court of equity with unclean hands relating to the transaction before the court, he will be denied relief. But in determining that issue the trial court can properly consider only whether the moving party has clean or unclean hands *in relation to the matters properly before the court*. The trial of the issue relating to clean hands cannot be distorted into a proceeding to try the general morals of the parties. To warrant denial of relief *the unclean hands must relate to the transaction before the court.*" (Emphasis added.)

This case and others cited by respondent have not been adequately answered by appellant. We find no merit in this point.

■ *Appellant's fifth and last contention* is "There was no adequate showing of mistake, negligence, or inadvertence."

The motion was heard on three affidavits of the moving party and three on behalf of the appellant. One of appellant's affidavits was made by the attorney who had represented her in the divorce proceedings. From this it appears that there was a conversation between himself and Lieutenant Hamrick on July 7, 1950, in which the former told the latter that he was mailing the affidavit to appellant and that a form of final decree was prepared and "that when said affidavit was executed and returned by said Agnes Hamrick, affiant

would present said affidavit and form of final decree of divorce to the above-entitled court to secure a final decree of divorce; *that affiant told said John Forrest Hamrick that he should not remarry until affiant notified him that said final decree had been obtained.*" (Emphasis obtained.)

Death of course prevented any comment by Lieutenant Hamrick on the attorney's version of the cautionary part of this conversation just emphasized, and technically, therefore, it stands uncontradicted. Nevertheless, the court could have concluded from all the circumstances that Hamrick might have mistaken or misunderstood what was said by the attorney, which mistake in itself would have come within the statutory language. In one of her affidavits respondent deposed that Lieutenant Hamrick had told her that the final judgment had been entered which, of course, would be additional evidence of mistake. On this question the presumptions were in favor of the respondent, namely, "That a person is innocent of crime or wrong;" (§ 1963, subd. 1). Here was an officer in the armed forces contemplating a second marriage, who admittedly had made inquiry of his wife's attorney respecting the time of entry of the final decree. No court would be inclined to presume that such officer with his commission and his military career at stake would wilfully and deliberately walk into a bigamous marriage. Nor, under section 1963, subdivision 1, is it to be presumed that respondent herself would do so. ■ In *Ortega* v. *Ortega,* 118 Cal.App.2d 589, 593 [258 P.2d 594] the settled rule on this subject is restated as follows: "When a person has entered into two successive marriages, a presumption arises in favor of the validity of the second marriage, and the burden is upon the party attacking the validity of the second marriage to prove that the first marriage had not been dissolved by the death of a spouse or by divorce or had not been annulled at the time of the second marriage. (*Hunter* v. *Hunter,* 111 Cal. 261 [43 P. 756, 52 Am.St.Rep. 180, 31 L.R.A. 411]; *Estate of Smith,* 33 Cal.2d 279, 281 [201 P.2d 539], and cases cited.) '. . . the burden is cast upon the party asserting guilt or immorality to prove the negative—that the first marriage had not ended before the second marriage.' (*Hunter* v. *Hunter, supra,* p. 267.)'' The trial judge had this rule and these presumptions to guide him in considering the affidavits on both sides of this motion, and his conclusion on the questions of fact thus presented is not to be disturbed on appeal.

Moreover, the record shows that no hasty action was taken by the court. The motion, filed in April, 1951, was heard and submitted on June 27th after a full presentation and argument. The order appealed from was presented, signed and filed on August 14, 1951. The record shows that the matter was carefully and thoroughly considered by the court.

The order appealed from is affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 22, 1953.