342 P.2d 94

**Howard B. CAHOON, Plaintiff and Respondent,**

**v.**

**Robert P. PELTON, Defendant and Appellant.**

**No. 8976.**

Supreme Court of Utah.

July 15, 1959.

VanCott, Bagley, Cornwall & McCarthy, Clifford L. Ashton, Leonard J. Lewis, Salt Lake City, for appellant.

McBroom & Hanni, Salt Lake City, for respondent.

WADE, Justice.

Defendant, Robert P. Pelton, appeals from a jury verdict judgment in favor of plaintiff, Howard B. Cahoon, respondent here, on two counts: the first for aliena-

tion of his former wife Dorothy's affections, and the second for criminal conversation with her. There were two trials: in the first the jury found no alienation of affections but that there was criminal conversation, assessing $20,000 compensatory and $5,000 punitive damages. After the first trial the court granted defendant's motion for a new trial after plaintiff refused its order to remit $19,000.

On the second trial the jury found in favor of plaintiff and awarded $25,000 general damages and $12,000 punitive damages on the criminal conversation count and $2,500 on the count for alienation of affections, and that plaintiff would have spent more than that amount to support his former wife had Pelton not led her away. The trial court cancelled and offset the verdict on the first cause of action against the jury's finding that it would have cost plaintiff more than that to have supported his wife had she remained with him, but refused to allow such offset against the verdict on the second count, holding that his actions were in accordance with the jury's intentions. The court also held the $12,000 punitive damages excessive, reducing them to only $1,000, and entered judgment for $26,000 and costs.

Plaintiff and Dorothy were married in Salt Lake City, June 28, 1947, where they lived for about two years, then made their home in Nevada until she obtained a non-contested divorce from him there on December 4, 1956, about a year before this action was commenced on October 7, 1957. Two children were born from this marriage. Dorothy married Gerald F. Shaw in December, 1957, in Las Vegas, Nevada. Prior to her marriage to plaintiff Dorothy was married to Mark H. Williams; they had two children. She obtained an interlocutory divorce decree from Williams in California March 18, 1946, ordering that a final decree be entered upon the expiration of one year. On June 7, 1948, after her marriage to plaintiff, she filed an affidavit for a final divorce judgment from Williams and such final decree was entered nunc pro tunc as of June 1, 1947, on June 23, 1948.

Defendant Pelton contends that since the final divorce decree in the Williams case was not entered until after plaintiff's marriage to Dorothy, such marriage is void because she had an undivorced living husband at that time.[1] California, the same as Utah, and all other states, holds that a second marriage is void if at the time one of the parties had an undivorced husband or wife living. Generally, the laws

---

1. See Section 30–1–2, subdivisions (2) and (7), and Section 30–3–8, all of Utah Code Annotated 1953. Also Sanders v. Industrial Commission, 64 Utah 372, 230 P. 1026; Utah Fuel Co. v. Industrial Commission, 65 Utah 100, 234 P. 697; Jenkins v. Jenkins, 107 Utah 239, 153 P.2d 262; In re Dalton's Estate, 109 Utah 503, 167 P.2d 690.

of the state where a marriage is consummated determine its validity.[2] The Utah laws provide for an interlocutory divorce decree which becomes final upon the expiration of the prescribed period, formerly six and now three months, without any further decree or order of the court unless an appeal or other proceedings for review are pending or the court within that time otherwise orders.[3] The California law, requiring the expiration of a longer period and also a separate final decree, even though it may be entered nunc pro tunc, is not contrary to our public policy.

The California statutes provide for the entry of an interlocutory judgment upon the court's determination that a divorce should be granted[4] and the entry of a final judgment upon the expiration of one year thereafter.[5] Section 133,[6] providing upon failure to enter the final decree at the expiration of one year for the entry of a judgment nunc pro tunc which, after slight amendments which are immaterial here, provides:

"Whenever either of the parties in a divorce action is, under the law, entitled to a final judgment, but by mistake, negligence or inadvertence the same has not been signed, filed and entered, if no appeal has been taken from the interlocutory judgment or motion made for a new trial to annul or set aside the judgment or for relief under Chapter 8, Title 6 of Part 2 of the Code of Civil Procedure, *the court, on the motion of either party thereto or upon its own motion, may cause a final judgment to be signed, dated, filed and entered therein granting the divorce as of the date when the same could have been given or made by the court if applied for.* The court may cause such final judgment to be signed, dated, filed and entered nunc pro tunc as aforesaid, even though a final judgment may have been previously entered whereby mistake, negligence or inadvertence the same has not been signed, filed or entered as soon as it could have been entered under the law if applied for. *Upon the filing of such final judgment, the parties to such action shall be deemed to have been restored to the status of single persons as of the date affixed to such judgment, and any marriage of either of such parties subse-*

2. Huard v. McTeigh, 113 Or. 279, 232 P. 658, 39 A.L.R. 528; Shippee v. Shippee, 95 N.H. 450, 66 A.2d 77.
3. See 30-3-6 and 30-3-7 U.C.A.1953, and the 1957 amendments thereto which reduces the time from six months to three months for the divorce decree to become absolute. See also Johnson v. Johnson, 116 Utah 27, 207 P.2d 1036.

4. See West's Annotated Civil California Codes, Section 131.
5. See West's Annotated Civil California Codes, Section 132.
6. See West's Annotated Civil California Codes, Section 133.

*quent to one year after the granting of the interlocutory judgment as shown by the minutes of the court, and after the final judgment could have been entered under the law if applied for, shall be valid for all purposes as of the date affixed to such final judgment, upon the filing thereof."* (Emphasis ours.)

Without exception, since that enactment, California has recognized the validity of the remarriage of a party to a divorce decree although the final decree was actually entered after the remarriage where the remarriage occurred after the nunc pro tunc date of the final decree.[7] California expressly recognizes under such nunc pro tunc decision that the parties thereto were restored to their status of single persons on the nunc pro tunc date of the final decree and thereupon became eligible for marriage to a third person.[8]

The validity of a second marriage in another state after a California nunc pro tunc final divorce decree under facts similar to these has been recognized a number of times.[9] We have found no contrary decisions. The New Hampshire and Maryland cases cited in note 9 involved nunc pro tunc California final decrees under this statute and the Oregon case involved a nunc pro tunc final decree entered in Washington state under a statute copied from the California statute. All these cases hold that the nunc pro tunc decree adjudicated that the parties were restored to their status as single persons upon the nunc pro tunc date of the final decree and were capable of contracting a valid marriage thereafter. Such is our holding in this case.

Defendant argues that Utah law does not permit an action for criminal conversation. We have no statute or judicial decision authorizing or approving such an action. Some states have by statute abolished such actions. Defendant contends that such actions are in disfavor and should not now be approved. He further contends that by Section 68–3–1, U.C.A.1953,[10] we adopted

---

7. See Macedo v. Macedo, 29 Cal.App.2d 387, 84 P.2d 552; Ringel v. Superior Court of Alameda County, 54 Cal.App.2d 34, 128 P.2d 558; In re Hughes' Estate, 80 Cal.App.2d 550, 82 P.2d 253; Hamrick v. Hamrick, 119 Cal.App.2d 839, 260 P. 2d 188; Nicolai v. Nicolai, 96 Cal.App.2d 951, 216 P.2d 913.

8. See Nicolai v. Nicolai, last case cited in note 7.

9. See Shippee v. Shippee, 95 N.H. 450, 66 A.2d 77; Bannister v. Bannister, 181 Md. 177, 29 A.2d 287; In re Kelley's Estate, 210 Or. 226, 310 P.2d 328.

10. Section 68–3–1, U.C.A.1953, provides: *"The common Law of England so far as it is not repugnant to, or in conflict with, the Constitution or Laws of the United States, or the Constitution or laws of this state,* and so far only as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people thereof, is hereby adopted, *and shall be the rule of decision in all courts of this state."* (Emphasis ours.) They indicate the statute as adopted in 1898; the other provision first appears in the Revised Statutes of Utah for 1933.

the common law of England, together with the statutes in effect in 1898, when that statute was originally enacted. He points out that the Matrimonial Causes Act of 1857 was in effect in England at that time, by which the common law of England action for criminal conversation was abolished and a claim for damages by a person who had sexual intercourse with claimant's wife could be claimed by the husband in a divorce action.[11] Under this statute defendant claims the common law action for criminal conversation did not exist.

■ Section 68–3–1 only adopts the common law of England so far "as it is consistent with and adapted to the natural and physical conditions of this State and the necessities of the people thereof" and not repugnant to or in conflict with the Constitution or laws of the United States or this State. Although the above quotation was added to our statute by the 1933 Revision, prior thereto in construing this statute in Hatch v. Hatch,[12] we held "that while Congress, by extending over the Territory of Utah the Constitution and laws of the United States put in force, in the language of the Supreme Court of the United States,[13] 'the system of common law and equity which *generally prevails* in this country,' yet did not so extend or transplant the *common law of England*, with all its rigor and harshness, but only so much of it as was and had been generally recognized and enforced in this country, and as is and was suitable to our conditions." (Emphasis by author of opinion quoted.) A glance at our decisions clearly shows that we follow the common law of England as developed and expounded by the courts of last resort in this country, but that only on rare occasions do we refer to or rely on the English decisions but constantly rely on the decisions of our sister states. Thus it is clear that by this statute we adopted the common law of England only where it is suitable to our conditions, morals, history and background, that generally we look to the system of common law and equity which prevails in and has been and is now being developed by the decisions of this country and that we reject the common law of England which is not suitable or adapted to our needs, morals or ideals.

The Hatch case involved the right of the heirs of a married woman to inherit her property as against the heirs of her

11. Counsel cites Buchanan v. Crites, 106 Utah 428, 150 P.2d 100, 103, 154 A.L.R. 167, to the effect that the common law of England as adopted by this statute "included all statutes in effect in England at the time of the adoption." See Syllabus 7. This statement was clearly only dictum, for the controlling features of that case were based on Utah statutes.

12. Hatch v. Hatch, 1915, 46 Utah 116, 148 P. 1096, 1100.

13. Mormon Church v. United States, 136 U.S. 1, 62, 10 S.Ct. 792, 34 L.Ed. 478, 481.

husband who outlived her. We held that the common law of England wherein the wife lost her separate identity with her right to sue and be sued and her property rights in general did not, with respect to such married women's rights become the law of this State.

■ The common law right of the husband to sue another person for criminal conversation with his wife, which was repealed or altered by the Matrimonial Causes Act of 1857, was based on the theory of a trespass against the wife which had to be brought by the husband because he and his wife were one, and all of her property and rights to manage the same and sue in connection therewith belonged to her husband. Such a right is contrary to the law on that subject as developed in this State and most, if not all, of the states in this country. Utah has completely emancipated and given a married woman the same rights as she would have had were she not married and the same rights to her separate property as her husband, both by our decisions and statutes.[14] The right of a husband to sue another man for criminal conversation with his wife as a trespass against her with the suit in his name, the theory being that they are one and she having, by marriage lost her right to sue along with her property rights in general, even though the act may be committed with her consent is inconsistent with our statutes and our concept of the rights of married women and did not become a part of the laws of this State.

■ This does not mean that in this State the husband has no right of recovery for criminal conversation or adultery with his wife by another man. But it does mean that such right of recovery is based on the exclusive right of either spouse to intercourse with the other. A person who violates this right, though with the consent or even enticement of the guilty spouse, is liable in damages to the innocent spouse. It is similar in some respects to the right against alienation of affections but is stronger in that it requires the commission of adultery in violation of the criminal law. Some states have by statute abolished liability for alienation of affections while retaining the liability for criminal conversation.[15]

There is an excellent statement of this right in 27 Am.Jur. 135, Husband and Wife, Section 535, as follows:

> but does not abolish a right of action for criminal conversation. See also 48 Purdon's Pennsylvania Statutes 1936 Compact Edition, Secs. 170, 171, which abolish actions for alienation of affections and breach of promise to marry, but we find no statute abolishing an action for criminal conversation.

14. See Taylor v. Patten, 2 Utah 2d 404, 275 P.2d 696 and cases therein cited.

15. See Rehling v. Brainard, 38 Nev. 16, 144 P. 167, approving the right to recover in such action. Sections 41.370 to 41.420 Nevada Revised Statutes abolishes a cause of action for breach of promise and alienation of affections

"A fundamental right which flows from the relation of marriage, and one which the well being of society requires should be maintained inviolate, is that of one spouse to have exclusive marital intercourse with the other, and whenever a third person commits adultery with either spouse, he or she commits a tortious invasion of the rights of the other spouse, from which a cause of action for criminal conversation arises."

The great majority of the decisions in this country agree with this statement. It is in accord with our statutes emancipating married women [16] and our decisions on the rights of married persons as between them and other persons who come between spouses.[17] So we conclude that the law of this State authorizes an action to recover damages for criminal conversation.

 In connection with this point and based on the common law of England defendant contends that the court erred in allowing the jury to return a verdict for punitive damages and receiving evidence of defendant's wealth on that question. What we have said on the common law of England and its application to this case applies to these contentions. As to the law of this State both of these contentions were decided against defendant in Wilson v. Oldroyd.[18] The reasons given in that case are equally applicable to this case, even though this is an action for criminal conversation, and the Wilson v. Oldroyd case was an action for alienation of affection.

 We have also previously decided squarely against defendant's contention that plaintiff's right to recover is barred by the previous divorce decree awarded to his wife on grounds of his misconduct in Sadleir v. Knapton.[19] There we held that the prior divorce decree was not res judicata as to plaintiff's claim against defendant because defendant was not a party to the divorce action. We further held that Section 30–3–9, U.C.A.1953, providing that the guilty party to a divorce decree "forfeits all rights acquired by marriage" only meant rights as between the parties to the marriage and did not include rights against a third party. We adhere to our previous decision on that question.

There are a number of reasons which refute defendant's contention that he was

16. See Sections 30–2–1 to 10, U.C.A.1953, also Taylor v. Patten, 1954, 2 Utah 2d 404, 275 P.2d 696, 698.

17. See Taylor v. Patten, cited in note 16, and the many cases cited in the statutes cited in that note. Utah has recognized the right to sue for alienation of the wife's affections, Sadleir v. Knapton, 1956, 5 Utah 2d 26, 296 P.2d 278, Wilson v. Oldroyd, 1 Utah 2d 362, 267 P.2d 759.

18. See Wilson v. Oldroyd, cited in note 17.

19. See Sadleir v. Knapton, cited in note 17.

prejudiced by the granting of a new trial on the first cause of action.

■ The plaintiff being satisfied with the amount of the $25,000 verdict for criminal conversation did not move for a new trial on the alienation of affections count which the jury found against him. He sought a new trial on that issue only after the court ordered a new trial when he refused to remit the difference between the $25,000 award and $6,000. Under these circumstances since the two causes of action arose out of the same set of facts, and the trial court found that the evidence on both causes of action presented a jury question, in fairness to plaintiff the court should have granted a new trial on both counts. Whether this is the effect of the court's original order for a new trial is uncertain. The order is in general terms and does not expressly specify that the new trial is granted on only one count, but does recite that defendant's motion for a new trial is granted. It is generally held that under these circumstances the new trial is granted on both counts.[20]

There were additional facts which clearly justify and show that the new trial was granted on both counts. The original judgment entered April 17, 1958, while quoting the jury's findings on both counts, entered judgment only for $25,000 and costs without expressly dismissing the first cause of action. After the court ordered a new trial when plaintiff refused to remit part of the original judgment, plaintiff prepared and, with the court's approval, there was entered a judgment expressly decreeing no cause of action on the first count. Plaintiff thereupon moved for a new trial on that judgment which the court granted after argument on September 11, 1958. Regardless of whether this procedure was necessary, it fully justified the court in ordering a new trial on both counts.

A complete answer to defendant's claimed error in granting a new trial on the first count is that no judgment was entered on that count against him. The trial court offset and cancelled the jury's verdict for $2,500 on that count against him because the jury also found it would have cost plaintiff more than that amount to support his wife had she remained with him. We are not called upon to pass upon the propriety of requiring the jury to determine such costs, nor the propriety of such offset of the amount against such costs, for we think the amount of the judgment entered appropriate in view of all the circumstances. Likewise, the refusal to enter a judgment on that count against defendant eliminates from our consideration defendant's contention that the evidence does not justify the submission of the first cause of action to

20. See Cramer v. Bock, 21 Wash.2d 13, 149 P.2d 525; 3 Am.Jur. 726, Appeal and Error, Sec. 1228; 66 C.J.S New Trial § 11, p. 99 also § 210, p. 541.

the jury because the acts occurred in Nevada, and Nevada has abolished an action for alienation of affections. So since no judgment was entered on that count the judgment is the same as if no verdict had been granted on the alienation of affections cause of action.

Many other points are argued on behalf of defendant and some on behalf of plaintiff under his cross-appeal. After careful consideration of all these arguments we conclude that they are without merit and we will not discuss them in detail.

Judgment affirmed. Costs to respondent.

F. W. KELLER, District Judge, concurs.

McDONOUGH, Justice, concurs in the result.

CROCKETT, Chief Justice (concurring).

I concur but desire to make these comments: Under some circumstances difficulties may be involved in holding that the entry of a final decree of divorce has the effect not only of making the decree final as of a prior date, but also of validating a marriage which was contracted before the final decree was in fact entered. It might produce confusion as to the status of persons subsequently relying on the validity or invalidity of such a decree.

Consider an example which might occur under the California statute: A wife is divorced from husband No. 1; after the year interlocutory period, but before the actual entry of a final decree, she marries husband No. 2; the latter discovers that the decree has never been entered and, relying upon that fact, obtains an annulment; the wife then marries husband No. 3; thereafter husband No. 1 has the final decree entered. The question arises: Which of the subsequent marriages is validated? If the later entry of a final decree would purport to validate the divorce as of a certain date and set in motion a chain reaction to rectify everything from that point on, further complications could exist where children may have been born, deaths, probates and vesting of personal or property rights had occurred based upon the assumption of validity or invalidity of such a decree. It is realized that the children would be legitimate under Utah law and be secure both in status and property rights, but this may not be so as to the spouses or to others whose rights may become involved.

The above difficulty is discussed, not to argue against the affirmance of the judgment, but to acknowledge the existence of the problem and to observe that the ruling herein should be restricted to the facts of this case. If and when situations such as postulated above arise, they would have to be dealt with upon the basis of law and equity applicable thereto.

I cannot bring myself to be too much concerned with the precedent this case would establish in that regard because upon facts here existing justice and good conscience seem to render imperative that the jury verdict and judgment be affirmed. The Cahoons married in good faith in the belief that Mrs. Cahoon's divorce was final. The finding of the jury presupposes that they were living happily together. If some technical defect in the marriage existed it is reasonable to assume that it would have been corrected, as it was. The mere fact of the existence of some such irregularity should afford the defendant no basis to wrongfully intrude into their relationship.

Analagous to the reasoning which has been applied to property rights: Mr. Cahoon had entered into the marriage and acquired such rights as he had in the marriage relationship in good faith and at least had them under what may be called a claim of right and with "color of title." Any technical defect affected only the rights between the spouses and was having no adverse effect upon the Cahoons. It should confer no right upon anyone assailing the marriage from without. Thus Mr. Pelton had no right to assert against the validity of the marriage and, in fact, had no knowledge other than that it was valid. He nevertheless engaged in the wrongful conduct. Under those circumstances it would seem to the writer a gross injustice to permit a wrongdoer to take advantage of a later discovered technical defect, which was no concern of his, and escape responsibility for having invaded the marriage and destroyed it.

HENRIOD, Justice (dissenting).

I dissent, believing plaintiff to have had no cause of action. Any alleged marriage with one not divorced from her husband, under Title 30-1-2, U.C.A.1953, is *void,*—not voidable,—not anything short of *void.* The woman here had absolutely no capacity to consummate a marriage here at the time it was undertaken. That should end the matter, and no extraterritorial statute or ministerial act, nunc pro tunc or otherwise, should be allowed to control the status of one applying for marriage here.

To determine other wise flouts the principle that the law of the forum controls matters of marriage status or the lack of it. To conclude otherwise allows a foreign state to determine the status of persons applying for marriage in Utah, strips our legislature of its absolute and inherent prerogative of determining who shall or shall not have capacity to marry here, and, now, after this decision, makes for judicial legislation on our part. It permits an individual, at his pleasure, to determine his own status in Utah, by invoking an extra-territorial statute and ministerial act through the simple device of filing or failing to file a paper elsewhere. I am aware of no instance where a state so benignly

has ceded its coveted powers. One is left to wonder what this court would have done had our statute contained a bit of surplusage saying that *irrespective of the statutes of any other state,* the marriage nonetheless would be void.

The main opinion cites no competent authority to sustain its assertion that "The validity of a second marriage *in another state* after a California nunc pro tunc final divorce decree under facts similar to this has been recognized a number of times." Two of the three cases cited, purporting to sustain such statement, Bannister v. Bannister and In re Kelley's Estate, do not support it at all. Both deal with cases of first and second marriages both occurring within the same "nunc pro tunc" state, *not one in another state.* The inaccuracy of the statement is apparent. It is conceded that in those cases the law of the forum would govern both marriages. But that does not mean that by self-serving legislation, a state can embark on an excursion into the legislative domain of another state and effectively tell the latter what persons can or cannot be capable of consummating a valid marriage there. The nunc pro tunc of California is the nullius juris of Utah insofar as it attempts to establish the qualifications and capacity for the marital status in the latter.

The only other case cited in the main opinion in support of its conclusion is that of Shippee v. Shippee. It is obvious that the Shippee case misapplied a different "nunc pro tunc" technique to an entirely different set of facts. Its conclusion that the California statute could validate an invalid New York marriage, obviously was arrived at on the authority of cases cited therein. With the exception of the California cases, which concededly must control there, *not one of the cases cited can apply to the situation here.* All of them say, and rightly, that a sister state must recognize judgments rendered in other states, though entered "nunc pro tunc." They all presuppose and assume, and the facts with which they are concerned clearly show, that a judgment *actually had been rendered,* but that through error, properly had not been perfected. Such is not the case here. No judgment was rendered here until long after the second marriage, and the "nunc pro tunc" California judgment was not designed to perfect a judgment already rendered but for some reason, erroneously not perfected. Based on such misapplication of an entirely different rule, with the court's indulgence in an unwarranted anachronism, the Shippee case is no authority for the decision here.

The conclusion here that allows an individual, at his pleasure, to declare his own status by filing or not filing a paper in another jurisdiction, cannot govern the state of Utah, and has ramifications that could result in a dangerous sapping of Utah's legislative strength.

Although it does not seem pertinent here, I challenge the contention of the main opinion that Utah has emancipated women completely by statute and by decision. It has done neither. There is nothing in Secs. 30–2–1 to 10, U.C.A.1953 that suggests any such thing. If the legislature had intended complete, rather than partial emancipation, one section would have sufficed instead of ten. As to Taylor v. Patten, cited in support of the contention, it does not support it at all. One justice and a district court judge replacing a disqualified justice, thought the case should stand for that proposition, two justices thought it shouldn't, by dissenting, and one justice thought it should *only during the interlocutory divorce period*. That case can be cited only for the proposition that a wife might sue her husband for an assault *only if the assault was committed during the interlocutory period*—(and I think even that went too far.)

In passing, it is difficult to see the consistency of Chief Justice CROCKETT's conclusion that one who alienates affections should not be allowed to advantage himself by a technicality, while the Chief Justice condones and approves a recovery by one who, by judicial finding and decree, has been held guilty of extreme mental cruelty toward the very one whose affections allegedly were alienated,—as is reflected in Mr. Chief Justice CROCKETT's concurrence not only here, but in Sadleir v.

Knapton. It seems that such conclusions result in the categorizing of wrongdoings into good or bad wrongdoings, and into compensable and noncompensable wrongdoings.

I think the case should be reversed with instructions to dismiss.

CALLISTER, Justice, not participating.