We cannot agree. First, the State misconstrues *Gibbons*. *Gibbons* does not simply state a preferred method for determining the voluntariness of a plea, but clearly mandates that the trial court must conduct an on-the-record review with defendant of the Rule 11(5) requirements. *Gibbons*, 740 P.2d at 1313–14. Also, the supreme court did not remand *Gibbons* for a hearing on the issue of voluntariness, but for the purpose of allowing defendant to move to withdraw his guilty plea because he had not previously filed such motion. *Id.* at 1311. Finally, it appears that the court applied the "record as a whole" test in *Jolivet* and *Copeland* because the guilty pleas in both cases were entered before the *Gibbons* decision: Jolivet entered his plea in 1984, *see State v. Jolivet*, 712 P.2d 843, 843–44 (Utah 1986) (date of plea revealed in Jolivet's first appeal), and Copeland entered his plea in 1986. *Copeland*, 765 P.2d at 1267.

STATE of Utah, In the Interest of
R.R., Plaintiff and Appellee,

v.

C.R. and R.R., Defendants
and Appellants.

STATE of Utah, In the Interest of
R.D.H., Plaintiff and Appellee,

v.

K.G., Defendant and Appellant.

Nos. 890058–CA, 890173–CA.

Court of Appeals of Utah.

Aug. 30, 1990.

---

Michael E. Bulson, Ogden, for defendants and appellants.

1. Robert L. Newey, Senior Juvenile Court Judge, *sitting by special appointment pursuant* to Utah Code Ann. § 78–3–24(10) (Supp.1990).

2. Section 78–3a–49(1) provides, in relevant part:

R. Paul Van Dam and Karl G. Perry, Asst. Atty. Gen., argued, Ogden, for plaintiffs and appellees.

Before GARFF, JACKSON and NEWEY,[1] JJ.

## OPINION

JACKSON, Judge:

In these consolidated cases, the parents of two minor boys appeal from juvenile court orders requiring them to pay the State for support furnished the two boys after they were adjudicated as within the juvenile court's jurisdiction and while they were in the temporary custody of state agencies. Because we conclude that the juvenile court erred in failing to determine whether the parents' support obligations were extinguished by the minors' emancipation through their own conduct, we vacate the orders of the juvenile court and remand for further proceedings consistent with this opinion.

In October 1984, R.R., nearly fifteen, left his parents' home and lived with various relatives. In the spring of 1985, a petition was filed with the juvenile court alleging that R.R. was a dependent child. *See* Utah Code Ann. § 78–3a–16(1)(c) (1987); Utah Code Ann. § 78–3a–2(20) (1987). When R.R.'s mother admitted the allegations in July 1985, the juvenile court found R.R. to be dependent within the meaning of the statute and temporarily awarded legal custody of R.R. to the Utah Department of Family Services (DFS). The juvenile court did not terminate the father and mother's parental rights pursuant to Utah Code Ann. § 78–3a–48 (1987), although the subject was raised at a May 1986 review hearing. In October 1986, the temporary order terminated and custody of R.R. was awarded to his parents, to be supervised by DFS until June 1987.

The State filed a petition against R.R.'s parents in the fall of 1988 pursuant to Utah Code Ann. § 78–3a–49 (1987),[2] seeking re-

(1) When legal custody of a child is vested by the court in an individual or agency other than his parents or a secure youth corrections facility, the court may in the same or any subsequent proceeding inquire into the ability

imbursement of $1,159.06 in support for R.R. expended by the State during the period of January 1985[3] through October 10, 1986. Relying on the common law doctrine of emancipation, R.R.'s parents contested the petition and claimed that their duty to support R.R. was terminated in October 1984 when he voluntarily left their home to live elsewhere and live a lifestyle of which they disapproved. According to the parents' unrefuted testimony, they never ordered R.R. to leave. They were willing to support him in their own home along with his younger siblings if he would agree to abide by their rules. R.R. left to reside elsewhere, they testified, because he refused to accept their condition that he give up his homosexual lifestyle. In response, the State argued that R.R.'s parents had not met their burden of proving emancipation because there was no evidence R.R. was financially independent or that he was able to provide his own residence. The State also argued that R.R. had not left home voluntarily because his parents had forced him to leave the household.

In ruling on R.R.'s parents' objections to the State's petition, the court made no detailed findings of fact on the emancipation question. Instead, the juvenile court judge expressed his appreciation to counsel for informing him of the numerous cases applying the doctrine of emancipation in other jurisdictions, but declined to consider it as applicable in Utah, stating, "[T]he court does not wish to adopt said decisions as law in this jurisdiction." R.R.'s parents were accordingly ordered to reimburse the State in an amount based on their available resources.

R.D.H., born in February 1971, was living with two siblings and his divorced mother, appellant K.G., in the summer of 1986 when he became increasingly violent and uncontrollable, frequently beating up other family members. K.G. occasionally called the police to intervene in these episodes. R.D.H. ran away from home a few times in the fall of 1986. In January 1987, R.D.H. got into an argument with his younger brother and kicked him. When K.G. intervened, R.D.H. hit her with his fist. When K.G.'s boyfriend came to her aid, R.D.H. attacked him with a barbell. The police were summoned and eventually took R.D.H. away. An assault charge was filed and the boy was detained at a youth home for a few days, then returned to his mother's home. He stayed there until March 8, 1987, when he ran away after climbing out a bedroom window and did not return. The record does not reveal R.D. H.'s means of support or his living arrangements from March 8 until August 1987, when the assault charge and other independent criminal charges against R.D.H. were adjudicated in juvenile court. *See* Utah Code Ann. § 78–3a–16(1)(a) (Supp.1990). At that time, R.D.H. was placed on probation and put into the custody of the Utah Division of Social Services.

In September 1988, the State filed a petition against K.G. pursuant to section 78–3a–49, seeking reimbursement for $8,287.42 expended as support for R.D.H. from August 1987 through March 1988. K.G. opposed the petition based on the common law doctrine of emancipation, claiming that R.D.H.'s violent conduct and voluntary departure from her home had resulted in a termination of her duty to support him during the period when support was supplied by the State. Once again, in cursory findings and conclusions, the juvenile court declined to apply the doctrine of emancipation, concluding it "is not statutory, nor is it founded upon clear case law of the State of Utah...." The court ordered K.G. to reimburse the State

---

of the parents, a parent, or any other person who may be obligated, to support the child and to pay any other expenses of the child, including the expense of any medical, psychiatric, or psychological examination or treatment provided under order of the court. The court may, after due notice and a hearing on the matter, require the parents or other person to pay the whole or part of such support and expenses, depending on their financial resources and other demands on their funds....

**3.** The record does not reflect the legal or factual basis for the State's request for reimbursement of support furnished R.R. during the six months before the court's order placing him in DFS custody.

in an amount based on her financial resources and obligations.

The basic issue presented in these appeals is whether the juvenile court erroneously concluded that the doctrine of emancipation is not a part of the law in Utah. This ruling involves a question of law, which we review for correctness with no deference to the lower court's determination. *E.g., Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1039 (Utah 1989); *Brinkerhoff v. Schwendiman,* 790 P.2d 587, 589 (Utah Ct.App.1990).

In American law, judicial emancipation refers to the nonstatutory termination of certain rights and obligations of the parent-child relationship during the child's minority. Katz, Schroeder & Sidman, *Emancipating Our Children—Coming of Legal Age in America,* 7 Fam.L.Q. 211, 214 (1973) (hereinafter Katz).

> As a result of statutory and common law developments, the American parent is generally held responsible for his child's financial support, health, education, morality, and for instilling in him respect for people and authority. To facilitate the performance of these obligations, the parent is vested with the custody and control of the child, including the requisite disciplinary authority. And, under a heritage of the past, the parent is also entitled to the child's services, and, by derivation, to his or her earnings. When a child is adjudicated a fully emancipated minor, these reciprocal rights and responsibilities are extinguished and are no longer legally enforceable: the emancipated child is thus legally treated as an adult.

Katz, 7 Fam.L.Q. at 214–15 (footnotes omitted). Although apparently undeveloped at English common law, *see In re Sonnenberg,* 256 Minn. 571, 575, 99 N.W.2d 444, 447 (1959), the doctrine of emancipation has been described as a "basic tenet of family law" in this country, applied by American courts since the early nineteenth century.[4] Katz, 7 Fam.L.Q. at 211 & n. 1. Some of the earliest pertinent reported decisions applied the doctrine of emancipation in common law actions by a third party to recover from parents for "necessaries" furnished minors who had voluntarily left home, although in some cases the party urging emancipation failed to establish adequate facts in support of it. *E.g., Cooper v. McNamara,* 92 Iowa 243, 60 N.W. 522 (1894) (recognizing doctrine but affirming award to third party against parent for board provided minor who had left parent's home and who earned his own living, because no emancipation found); *Brosius v. Barker,* 154 Mo.App. 657, 136 S.W. 18 (1911) (affirming judgment for defendant father, where jury found minor, who moved out west and received medical treatment from plaintiff, to be emancipated); *Wallace v. Cox,* 136 Tenn. 69, 188 S.W. 611 (1916) (no emancipation where minor's refusal to move to next county with father and her employment away from home before obtaining medical treatment were regarded as temporary). In several nineteenth century decisions, the fact that a minor voluntarily abandoned the parent's home to pursue a life free from parental control was alone considered sufficient to support a finding of emancipation that terminated the parent's duty of support. As a result, third parties who subsequently furnished necessaries to the minor could not recover from the parent, even in the absence of evidence that the minor was either capable of self-support or had actually supported himself. *E.g., Hunt v. Thompson,* 4 Ill. 179 (1841); *Angel v. McLellan,* 16 Mass. 28 (1819); *Weeks v. Merrow,* 40 Me. 151 (1855); *see also Ramsey v. Ramsey,* 121 Ind. 215, 23 N.E. 69 (1889).[5]

**4.** For example, in 1818 the Supreme Judicial Court of Massachusetts used the emancipation doctrine to protect a minor's right to retain compensation paid for his labor:

> But where the father has discharged himself of the obligation to support the child, or has obliged the child to support himself, there is no principle, but that of slavery, which will continue his right to receive the earnings of the child's labor.... [T]he law will imply an emancipation of the son....

*Nightingale v. Withington,* 15 Mass. 272, 274 S. 75 (15 Tyng) (1818).

**5.** The cases are collected in Annotation, *Parent's Obligation to Support Unmarried Minor Child Who Refuses to Live with Parent,* 98 A.L.R.3d

As the cases relied upon below by the parties amply demonstrate, the doctrine of emancipation continues to be an accepted part of the common law in this country. Regardless of whether courts ultimately determine that there have been actual emancipations, they nonetheless apply the doctrine in actions by divorced custodial parents seeking enforcement of support orders against former spouses who claim that their children should be judicially found to be emancipated, *e.g., Napolitano v. Napolitano*, 732 P.2d 245 (Colo.Ct.App.1986); *In re Marriage of Donahoe*, 114 Ill.App.3d 470, 70 Ill.Dec. 152, 448 N.E.2d 1030 (1983); *Biermann v. Biermann*, 584 S.W.2d 106 (Mo.Ct.App.1979); *Fevig v. Fevig*, 90 N.M. 51, 559 P.2d 839 (1977); *Niesen v. Niesen*, 38 Wis.2d 599, 157 N.W.2d 660 (1968), in actions by minors to recover support directly from a parent, *e.g., Roe v. Doe*, 29 N.Y.2d 188, 324 N.Y.S.2d 71, 272 N.E.2d 567 (1971) (duty of support terminated by daughter's actions in voluntarily abandoning father's home to avoid parental control); *Debra R. v. Sidney R.*, 85 Misc.2d 914, 380 N.Y.S.2d 579 (Fam.Ct.1976) (dismissing petition for support where minor on public assistance had emancipated herself by voluntarily leaving parent's home without justification), and in common law actions for necessaries furnished minors by third parties, *e.g., Ison v. Florida Sanitarium and Benevolent Assoc.*, 302 So.2d 200 (Fla.Ct.App.1974).

There are also modern cases applying the doctrine in statutorily authorized actions by state agencies against parents to recover public assistance provided to minor children. For example, in *Parker v. Stage*, 43 N.Y.2d 128, 400 N.Y.S.2d 794, 371 N.E.2d 513 (1977), the New York Court of Appeals affirmed a lower court's dismissal of the Department of Social Services' statutory action against a parent for payment of support to a minor who had obtained public assistance from the Department. The lower court had determined that the minor had emancipated herself by leaving the parent's

home to live with her lover. The appellate court examined the New York reimbursement statute, which parallels our own section 78–3a–49 in that it gives the trial court discretion to order repayment of support provided by a state agency, and concluded that, in light of the daughter's actual emancipation by her own conduct, the lower court had properly exercised its discretion under the statute by refusing to compel the parent to pay support. *See id.*, 400 N.Y. S.2d 794, 371 N.E.2d at 514–16. In a more recent case, *State Dep't of Human Resources v. McGraw*, 68 Or.App. 834, 683 P.2d 154, *rev. denied*, 298 Or. 238, 691 P.2d 482 (1984), the Court of Appeals of Oregon considered a statute requiring parents to repay public assistance provided their dependent children. The court refused to construe the statute as applicable in circumstances where the minor, who had left her parent's home without good cause, was "dependent" only in the sense that virtually every child is economically dependent on parents or others. *Id.*, 683 P.2d at 156; *but see State ex rel. Lacey v. Hargrove*, 89 Or.App. 17, 747 P.2d 366 n. 1 (1987) (dictum suggesting *McGraw* ruling abrogated by legislative enactment of Uniform Reciprocal Enforcement of Support Act).

■ In the instant cases, the juvenile court believed that the doctrine of emancipation is not presently part of Utah law because it has not been expressly adopted in a statute or a Utah appellate court opinion. In light of Utah Code Ann. § 68–3–1 (1986), the trial court's conclusion of law is incorrect. That section, a part of Utah's statutes since statehood in 1898,[6] provides:

> The common law of England so far as it is not repugnant to, or in conflict with, the constitution or laws of the United States, or the constitution or laws of this state ... is hereby adopted, and *shall be the rule of decision in all courts of this state.*

(Emphasis added). This provision has been interpreted as the Utah legislature's adop-

334 (1980), and Annotation, *What Voluntary Acts of Child, Other than Marriage or Entry into Military Service, Terminate Parent's Obligation to Support,* 32 A.L.R.3d 1055 (1970).

**6.** 1898 Utah Revised Statutes § 2488; 1933 Utah Revised Statutes § 88–2–1.

tion at statehood of the common law as it had been developed by the state courts of last resort in this country, not just as it was in England at a fixed point in time. *Cahoon v. Pelton*, 9 Utah 2d 224, 342 P.2d 94, 98 (1959); *Hatch v. Hatch*, 46 Utah 116, 148 P. 1096, 1100 (1916).

We hold that the common law doctrine of emancipation is, by virtue of section 68–3–1, a part of the law of this jurisdiction constituting the rule of decision in Utah courts, unless it conflicts with the statutes or constitutions of the United States or of Utah. Since the final orders appealed from are based on an erroneous legal conclusion to the contrary, we vacate the orders in both cases and remand them to the juvenile court for further proceedings.

On remand, the trial court should first articulate, based on its review of the decisions of courts of other states, what factors are relevant to a determination of whether emancipation has occurred.[7] Second, the court must determine, based on the subsidiary factual findings it makes on the evidence in the record, whether appellants in each case established that their sons were actually emancipated, and that appellants' obligations to support were thereby terminated, before and during the time the state agencies provided support to the minors. Finally, if the trial court assumes or finds actual emancipation during the relevant time periods, it must also determine as a matter of law whether application of the doctrine of emancipation in either case would be inappropriate because it would conflict with any Utah law, such as section 78–3a–49 or Utah Code Ann. §§ 78–45–3, –4, –4.3 (1987).[8] *See Hansen v. Utah State Retirement Bd.*, 652 P.2d 1332, 1337 (Utah 1982) (where common law and statute conflict, former must yield).

We caution that our disposition of the appeals before us should not be read as an expression of our views on the merits of these issues. It is for the trial court, not for this court, to make the necessary factual and legal determinations in the first instance, however difficult or novel the questions presented may be.

GARFF and NEWEY, JJ., concur.

7. See, for example, the factors noted in *Napolitano v. Napolitano*, 732 P.2d 245, 246 (Colo.Ct. App.1986).

8. Subsections –3 and –4 set forth both parents' duties to support their child. Section 78–45–4.3 provides:

Notwithstanding § 78–45–2, a natural or an adoptive parent or stepparent whose minor child has become a ward of the state is not relieved of the primary obligation to support that child until he reaches the age of majority.